Sean T. Malone OR Bar # 084060
Attorney at Law
259 E. 5th Ave., Ste 200-G
Eugene OR 97401
seanmalone8@hotmail.com
Ph. 303-859-0403

*Attorney for Proposed Amicus Curiae*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **BARK,** an Oregon non-profit corporation, **FRIENDS OF MOUNT HOOD,** an Oregon non-profit corporation, **NORTHWEST ENVIRONMENTAL DEFENSE CENTER,** an Oregon non-profit corporation, **THE SIERRA CLUB**, a California non-profit corporation,<br><br>    Plaintiffs,<br><br>  v.<br><br>**LISA NORTHROP,** Forest Supervisor of the Mt. Hood National Forest, **BILL WESTBROOK,** Zigzag District Ranger, **KENT CONNAUGHTON**, Regional Forester for Region 6, and the **UNITED STATES FOREST SERVICE**, a federal agency; **WILLIAM STELLE**, Regional Administrator of the West Coast Region, and the **NATIONAL MARINE FISHERIES SERVICE**, a federal agency,<br><br>    Defendants,<br><br>**RLK AND COMPANY**, an Oregon corporation,<br><br>    Defendant-Intervenor. | **Case No. 3:13-cv-00828-AA**<br><br>**BRIEF OF AMICUS CURIAE** |

Brief of Amicus Curiae - i

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

## TABLE OF CONTENTS

INTERESTS OF AMICUS CURIAE ........................................................................ 1

BACKGROUND ................................................................................................... 2

ARGUMENT ........................................................................................................ 4

   I.   Public participation and full disclosure of environmental effects are important action-forcing mechanisms of NEPA that are implicated in the current case ........................................ 4

   II.   The Forest Service failed to prepare environmental analysis under the National Environmental Policy Act upon acceptance of the Master Development Plan and amendment of the Special Use Permit ................................................................................... 5

      A.   Disclosure of environmental effects and public participation are not meaningfully implemented without NEPA analysis ................................................................ 5

      B.   The Forest Service's acceptance of the Timberline Master Development Plan and amendment of the Special Use Permit was final agency action ............................... 6

      C.   The Forest Service's acceptance of the Master Development Plan and amendment of the Special Use Permit triggers National Environmental Policy Act review ........................... 11

   III.   The Forest Service should prepare an Environmental Impact Statement for the bike facility project because it may result in significant environmental effects ............................... 15

      A.   An Environmental Impact Statement is required because the Project may have significant environmental effects according to a single significance factor or a combination of significance factors under the National Environmental Policy Act .......................... 15

         1.   The Project may be significant because of controversial environmental impacts ...... 16

         2.   The Project may be significant because the possible effects on the human environment are highly uncertain or involve unique or unknown risks .......................... 18

         3.   The Project may be significant because the Project may adversely affect LCR steelhead ................................................................................................ 20

CONCLUSION .................................................................................................. 20

**Brief of Amicus Curiae** - ii

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

TABLE OF AUTHORITIES

**Cases**

*Ark Initiative v. U.S. Forest Serv.*,
   Case No. 06-02418-WDM-MJW, 2010 U.S. Dist. LEXIS 94921 (D. Colo. 2010).......... 8, 9, 10
*Barnes v. U.S. Dep't of Transp.*,
   655 F.3d 1124 (9th Cir. 2011)................................................................................. 19
*Bennett v. Spear*,
   520 U.S. 154 (1997) .............................................................................................. 6
*Blue Mountains Biodiversity Proj. v. Blackwood*,
   161 F3d 1208 (9th Cir. 1998)................................................................................. 15
*Cascadia Wildlands v. U.S. Forest Serv.*,
   937 F.Supp. 2d 1271 (D. Or. 2013)............................................................... 15, 16, 20
*Drakes Bay Oyster Co. v. Salazar*,
   921 F.Supp.2d 972 (N.D. Cal. 2013), *aff'd on other grounds*, *Drakes Bay Oyster Co. v. Jewell*,
   729 F.3d 967 (9th Cir. 2013)................................................................................. 7
*Earth Island Inst. v. U.S. Forest Serv.*,
   442 F.3d 1147 (9th Cir. 2006)................................................................................. 4
*Envtl. Ethics v. U.S. Forest Serv.*,
   451 F.3d 1005 (9th Cir. 2006)................................................................................. 20
*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .............................................................................................. 13
*Friends of Mt. Hood v. U.S. Forest Service*,
   Case No. 97-1787-KI, 2000 U.S. Dist. LEXIS 18309 (D. Or. Dec. 15, 2000) ......................... 6
*Grand Canyon Trust v. U.S. Bureau of Reclamation*,
   691 F.3d 1008 (9th Cir. 2012)................................................................................. 12
*Idaho Sporting Congress v. Rittenhouse*,
   305 F.3d 957 (9th Cir. 2002)................................................................................. 4
*Klamath-Siskiyou v. BLM*,
   387 F.3d 989 (9th Cir. 2004)................................................................................. 4
*Nat'l Parks & Conservation Ass'n v. Babbitt*,
   241 F.3d 722 (9th Cir. 2001)............................................................................. 16, 18
*Native Ecosystems Council v. U.S. Forest Serv.*,
   428 F.3d 1233 (9th Cir. 2005)................................................................................. 4
*North American Wild Sheep v. U.S. Dept. of Agriculture*,
   681 F.2d 1172 (9th Cir. 1982)................................................................................. 4
*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
   117 F.3d 1520 (9th Cir. 1997)................................................................................. 16

**Brief of Amicus Curiae** - iii

*Bark, et al. v. Northrop et al.*,
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2004)........................................................................ 15
*Okanogan Highlands Alliance v. Williams*,
  236 F.3d 468 (9th Cir. 2000)........................................................................ 18
*Oregon Wild v. Bureau of Land Mgmt*,
  Case No. 14-0110-AA, 2015 U.S. Dist. LEXIS 32584, *32 (March 14, 2015)...................... 16
*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ................................................................................ 4
*S. Fork Band Council of W. Shoshone v. U.S. DOI*,
  588 F.3d 718 (9th Cir. 2009)........................................................................ 18
*Western Montana., Inc. v. Austin*,
  Case No 13-282-M-DWM, 2015 U.S. Dist. LEXIS 61244 (D. Mont. May 11, 2015).............. 7

**Statutes**

42 U.S.C. § 4332(2)(C).................................................................... 11, 15

**Regulations**

36 C.F.R. § 220.6(d)(10)............................................................... 16
36 C.F.R. § 251.54(e)(6)............................................................... 13
40 C.F.R. § 1508.18(b)(2).............................................................. 12
40 C.F.R. § 1508.27................................................................... 17
40 C.F.R. § 1508.27(b)................................................................ 18
40 C.F.R. § 1508.27(b)(5)............................................................. 21
40 C.F.R. § 1508.27(b)(9)............................................................. 23
40 C.F.R. 1508.23.................................................................... 13

**Brief of Amicus Curiae** - iv

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

Mazamas respectfully submits this *amicus curiae* brief in support of the Motion for Summary Judgment and Combined Response/Reply filed by Plaintiffs BARK *et al*. *See* ECF No. 118, 156.

INTERESTS OF AMICUS CURIAE

Before the Court are issues of significant interest to the Mazamas because they implicate the long-term planning and use of a resource central to the Mazamas' foundation and continual use. The Mt. Hood summit hosted the founding of Mazamas in 1894, and, ever since, Mazamas have had a "significant stake in the future of the mountain and its historical and natural environs." Declaration of John Rettig (Rettig Decl.), ¶2. The south side of Mt. Hood "could be considered Mazamas' 'home' in many ways." *Id*. With such a significant stake in development on Mt. Hood, Mazamas are eager to engage with recreational users, ski area operators, the Forest Service, and other users both informally and under the formal public participation and disclosure goals of the National Environmental Policy Act (NEPA). With the Master Development Plan (MDP) in question, however, no formal process of gathering public input was required, and, therefore, the MDP does not reflect a shared public vision for the south side of Mt. Hood. NEPA analysis, including programmatic NEPA analysis, is an important tool that brings together the many stakeholders for their input in the long-term uses and development of Mt. Hood. In particular, programmatic NEPA analysis allows for informed decision-making as it concerns proposed alternatives, cumulative effects of various proposals, and public involvement for actions in a particular locale, such as the development areas on the south side of Mt. Hood.

"The Mazamas' mission is to promote mountaineering through education, climbing, hiking, fellowship, safety, and the protection of mountain environments." *Id*. at ¶ 3. To

**Brief of Amicus Curiae** - 1

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

implement that mission, the Mazamas "organize some of the largest and highest quality climbing and hiking programs in the Northwest, helping more than 16,000 people a year to experience the pristine beauty of the Pacific Northwest and other regions." *Id*. The Mazamas were "involved in the transition of the Cascade Forest Reserve into what we now know as Mt. Hood National Forest," *id*. at 4, and "have many times in the past participated in the planning process on Mt. Hood, notably in 1964 for the Wilderness Act, in 1977 and 1989 regarding the Timberline Palmer lift improvements, and in 1998 regarding Meadows parking expansion." *Id*. Mazamas does not limit its participation to large matters: "[m]any other more minor proposals received our scrutiny and comments on a monthly basis. The issues we addressed have been both those that directly affected our access to alpine areas for our outdoor activities, and also those that had little or no bearing on our access but did affect the mountain environment that we are committed to protect." *Id*. "The Mazamas' future on Mt. Hood tomorrow depends upon our vigilance today of development activities, and our continued participation in planning processes." *Id*. at 5. Despite participating extensively in past projects and long-term planning on Mt. Hood, the Mazamas and the public have simply not been involved in this planning process. The MDP for Timberline was accepted by the USFS without any process to consider alternatives, incorporate public input, or disclose the cumulative environmental impacts of the proposed developments. The disposition of this case is, therefore, of significant interest to the Mazamas and the public.

## BACKGROUND

Mt. Hood is an iconic environmental and recreational asset to Oregonians and the Mazamas. Balancing Mt. Hood's outstanding recreational opportunities with environmental protection rests upon implementation of federal environmental laws requiring public

**Brief of Amicus Curiae** - 2
*Bark, et al. v. Northrop et al.*,
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

participation and disclosure of environmental impacts. *See Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002) (NEPA requires federal agencies "to consider every significant aspect of the environmental impact of a proposed action" and "ensure that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."). Mazamas have routinely engaged with the Forest Service on matters affecting Mt. Hood to advance recreational and conservation efforts. Public participation and candid disclosure of environmental impacts are inherently valuable to Mazamas and their continued use of Mt. Hood.

The current development proposal for a lift-assisted mountain bike facility at Timberline Lodge includes a 17-mile trail network and a separate 0.2-acre skills park. AR-27736. Trails will cross perennial and ephemeral stream channels, NMFS-737, and sedimentation to streams would be measured in tons per year, NMFS-763-64. The development contains three elements, including (1) construction, (2) long-term maintenance and operation, and (3) watershed restoration activities. NMFS 734. Of significant concern to the Mazamas is the third development component because past restoration efforts have proved to be far less successful than anticipated.[1] *See* FS 2nd Supp 291-310, FS 2nd Supp 702-721, AR-21069-21091. Because the MDP submitted by the RLK in 2009 outlined plans for multiple developments over the next 10 years in an area that is struggling to maintain its environmental integrity, it is important for the public and the Mazamas to have their voices heard and incorporated into the MDP.

---

[1] To be clear, the Mazamas believes mountain biking is an appropriate use of public lands, and many members own mountain bikes and are interested in seeing more developed opportunities for mountain biking on the Mt. Hood National Forest.

**Brief of Amicus Curiae** - 3

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

ARGUMENT

I.    Public participation and full disclosure of environmental effects are important action-forcing mechanisms of NEPA that are implicated in the current case

Under NEPA, "[t]he sweeping policy goals announced in § 101 are [] realized through a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *California v. Block*, 690 F.2d 753, 776 (9th Cir. 1982) ("NEPA's central requirement is that agencies must take a 'hard look' at the *environmental* consequences of its proposed action") (emphasis in original).  The public may submit comments on projects, apprising the agency of possible environmental impacts, and NEPA's hard look requirement puts the onus on the agency to fully disclose environmental impacts.  For the courts, "the task is to ensure that the agency has taken a 'hard look' at the potential environmental consequences of the proposed action." *Klamath-Siskiyou v. BLM,* 387 F.3d 989, 993 (9th Cir. 2004).

A hard look includes "considering all foreseeable direct and indirect impacts." *Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).  "A hard look should [also] involve a discussion of adverse impacts that does not improperly minimize negative side effects." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1159 (9th Cir. 2006) (citing *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1241 (9th Cir. 2005)); *North American Wild Sheep v. U.S. Dept. of Agriculture*, 681 F.2d 1172, 1178, 1179 (9th Cir. 1982) (hard look entails addressing "certain crucial factors, consideration of which was essential to a truly informed decision whether or not to prepare an EIS.").  The Forest Service "must 'undertake a thorough environmental analysis before concluding that no significant environmental impact exists.'" *Native Ecosystems Council*, 428 F.3d at 1239.  Because the long-

**Brief of Amicus Curiae** - 4

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

term planning and use of Mt. Hood implicates a variety of different stakeholders and interests,

the Mazamas believes that public participation and the requisite "hard look" are necessary to

arrive at a truly informed decision about development plans on the south side of Mt. Hood.

II.  The Forest Service failed to prepare environmental analysis under the National
Environmental Policy Act upon acceptance of the Master Development Plan and
amendment of the Special Use Permit

A.  Disclosure of environmental effects and public participation are not meaningfully
implemented without NEPA analysis

Given the wide assortment of recreational users and other interested stakeholders on Mt.

Hood, the Mazamas advocates for full disclosure and public participation permitted under federal

law when proposals implicate the environmental, cultural, and recreational resources of Mt.

Hood.  It is important to recall the context at issue here.  Ski areas operate on national forest

lands at the pleasure of the public.  Indeed, the Special Use Permit (SUP) at issue contains a

clause reserving the Forest Service's right to terminate the permit if it is in the "public interest."

AR-9894.  Expansion of the existing facilities on public lands with a "public building of national

significance" (AR-10859) should carry with it the full disclosure and participation afforded

under the law.  Visitors to the south side of Mt. Hood include the full spectrum and panoply of

forest users, including skiers, hikers, climbers, cyclists, climbers, berry pickers, wildflower and

wildlife viewers, and visitors to the historic lodge, to name just a few.  Therefore, for such a

significant recreational, social, cultural, and environmental resource, disclosure of environmental

effects and public participation must be meaningfully addressed, and NEPA ensures that these

paramount considerations will be pursued through its action-forcing mechanisms.

In the context of this case, programmatic NEPA analysis provides the necessary

framework to fully disclose environmental effects and engage the many stakeholders.  Once that

**Brief of Amicus Curiae** - 5

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

framework is laid, then site-specific impacts can be evaluated for site-specific development.  *See Friends of Mt. Hood v. U.S. Forest Service,* Case No. CV 97-1787-KI, 2000 U.S. Dist. LEXIS 18309 (D. Or. Dec. 15, 2000) ("When a programmatic EIS is prepared, site-specific impact need not be fully evaluated until a critical decision has been made to act on site development."). Issues raised by the National Ski Area Association (NSAA) in their *amicus* brief (ECF No. 142-1) appear to minimize the role of and importance of NEPA in matters affecting public lands and significant natural resources, including the Mt. Hood National Forest.  Mazamas believes that public participation and the "hard look" are inherently valuable, not just for the members and supporters of Mazamas, but for all users of public lands.

> B.    The Forest Service's acceptance of the Timberline Master Development Plan and amendment of the Special Use Permit was final agency action

Under the Supreme Court's decision in *Bennett v. Spear,* 520 U.S. 154, 177-178 (1997), the Forest Service's acceptance of the MDP and amendment of the SUP is final agency action pursuant to the Administrative Procedure Act (APA).  The two necessary criteria for final agency action are that (1) "the action must mark the 'consummation' of the agency's decision making process – it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Id.* (quotations omitted).  Here, the Forest Service's acceptance of the MDP and amendment of the SUP satisfies both criteria under *Bennett*.

The Forest Service's acceptance of the MDP and amendment of the SUP constituted the consummation of the agency decision making because it expanded the scope of development that may occur at Timberline.  AR-9885.  It set the stage for what development was possible at Timberline.  In other words, without the act of accepting the MDP and amending the SUP, the

**Brief of Amicus Curiae** - 6

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

proposed bike facility could not have moved forward.[2]  Regardless of whether the bike facility needs subsequent authorization to be constructed, including the bike facility in the MDP and SUP was the end of the agency's authorization as to what facilities or development could potentially be included in future development at Timberline.

In *Western Montana., Inc. v. Austin*, Case No. 13-282-M-DWM, 2015 U.S. Dist. LEXIS 61244 (D. Mont. May 11, 2015), the District Court of Montana considered whether the Forest Service's denial of a SUP for a ski area development was arbitrary and capricious.  The court concluded that the denial constituted final agency action.  *Id.* at 18-19.  Here, the Forest Service accepted the MDP and amended the SUP, but argues that there was no final agency action.  If *Western Montana* recognizes that the denial of a SUP represents final agency action, then it follows that an amendment of an SUP is also final agency action.  *See Drakes Bay Oyster Co. v. Salazar*, 921 F.Supp.2d 972, 984, 987 (N.D. Cal. 2013), *aff'd on other grounds*, *Drakes Bay Oyster Co. v. Jewell*, 729 F.3d 967 (9th Cir. 2013) (decision not to issue special use permit constitutes "agency action"; courts may review whether the agency "properly considered the promulgated factors").  If the shoe were on the other foot and the MDP was not accepted and the SUP amendment was denied, then it is likely that RLK would argue that the denial was final agency action, as was the case in *Western Montana*.

In authorizing the various facilities, the Forest Service determined legal rights and obligations because the Forest Service changed the permissible scope of the possible facilities and development at Timberline.  Without that authorization, a particular development could

---

[2] From the Mazamas' perspective, the issue is not with the bike facility itself, but rather that the bike facility project moved forward under an MDP that was accepted without formal public input or environmental review.

**Brief of Amicus Curiae** - 7

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

never proceed to fruition. In *Bennett*, the Supreme Court determined that a Biological Opinion and Incidental Take Statement determined legal rights and obligations because it "alter[ed] the legal regime to which the action agency is subject, authorizing it to take the endangered species if (but only if) it complies with the prescribed conditions." *Id*. at 178. Here, the acceptance of the MDP and amendment of the SUP altered the legal regime because it allows permissible facilities and development that would otherwise not be permitted at Timberline. In the absence of MDP acceptance and SUP amendment, there would exist no authority to approve particular facilities or development. Therefore, MDP acceptance and SUP amendment determined legal rights and obligations.

The NSAA cites to *Ark Initiative v. U.S. Forest Serv.*, Case No. 06-cv-02418-WDM-MJW, 2010 U.S. Dist. LEXIS 94921 (D. Colo. 2010), for the widespread proposition that MDPs do not represent final agency action. ECF No. 142-1 at 16-17. The NSAA's reliance on *Ark Initiative* is misplaced for several reasons. First, the 1991 MDP in *Ark Initiative* did undergo NEPA analysis with a full EIS. *See Ark Initiative*, 2010 U.S. Dist. LEXIS 94921, at * 3 ("In 1994, acting on the submitted MDP, the forest Service issued a Final Environmental Impact Statement ('1994 EIS'), which compared a number of alternatives for development pursuant to the MDP, including a no action alternative."). Importantly, that NEPA analysis resulted in approval of only a limited portion of the development activities proposed in the 1991 MDP. *Id.* ("In March 1994, the Forest Service issued a Record of Decision … approving portions of the MDP based on the 1994 EIS"; and "[t]he 1994 ROD also disapproved of some options of the 1991 MDP and did not authorize these proposed activities."). Here, on the other hand, the public was not able to weigh-in on the MDP to advocate for or against some or all of the development

**Brief of Amicus Curiae** - 8
*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

proposals.  As a result, all of the proposed development proposals were approved.  In other

words, whatever was proposed for the MDP ultimately became part of the MDP, which defined

the allowable scope of activities from the beginning.

Second, at issue in *Ark Initiative* was the mere amendment of an MDP.  *See id.* at 5 ("In

2003, Aspen Skiing sought to amend the 1994 MDP by submitting a master plan amendment to

the Forest Service").  The plaintiffs in *Ark Initiative* argued that the amendment, not the

wholesale replacement, of the MDP triggered NEPA review.  Here, on the other hand, the facts

are distinct because the Forest Service accepted a new MDP (instead of an amendment to an

existing MDP) and amended the SUP.  Therefore, *Ark Initiative* is factually distinguishable.

Third, when summarizing the holding in *Ark Initiative*, the NSAA appears to conflate the

issues of final agency action for purposes of review under the APA and action sufficient to

trigger review under NEPA.[3]  *See* ECF No. 142-1 at 16-17.  For example, the NSAA argues that

"the [MDP] at issue does not contain any binding decisions or commitments that would have an

immediate impact on the physical environment[.]"  *Id.*  The issue of binding decisions or

commitments implicates the issue of final agency action, whereas the reference to the impact on

the physical environment implicates whether there is sufficient environmental impact to trigger

NEPA review.  Because the issues of final agency action and agency action sufficient to trigger

NEPA are distinct, this Court should be cautious in its reading of *Ark Initiative*.

Fourth, the court in *Ark Initiative* expressly limited its ruling to the facts of that case,

stating:  "Although I do not by my ruling suggest that all amendments to master plans should not

be considered a final agency action, under the circumstances presented here I conclude that the

---

[3] To be fair, this conflation stems from the *Ark Initiative* court's conflation of these two issues.

**Brief of Amicus Curiae** - 9

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

Forest Service's action is not final." *Ark Initiative,* 2010 U.S. Dist. LEXIS 94921, at * 17.  This Court should not accept the NSAA's invitation to broadly apply the holding in *Ark Initiative*. *Ark Initiative*, therefore, should be limited to its unique facts, as suggested by the court.

Finally, the NSAA cites to *Ark Initiative* for the argument that "the acceptance of [MDP] in no way guarantees that all elements represented … will be approved in the future…." *Id.* at 16.  Regardless of whether a project, once authorized, is ever ultimately completed is separate from the issue of whether a decision represents final agency action.  The important point is that MDP acceptance and SUP amendment define the allowable scope of the future development at Timberline, which not only determines rights and obligations but also represents the final word on what site-specific facilities or development may proceed.

The NSAA also argues that "[t]he Forest Service does not authorize an MDP," ECF No. 142-1 at 6, and that "the Forest Service did not take any position on the elements of the MDP," *id.* at 17.  However, the NSAA plainly admits that the Forest Service "'accepts' [the MDP] if *it deems it appropriate*." *Id*. at 6 (emphasis added).  There is no significant difference between the Forest Service authorizing an MDP and the Forest Service accepting an MDP that the Forest Service deems appropriate.  The NSAA's argument is simply semantics.  Under either wording, the Forest Service stamps the MDP with its official imprimatur.  Though subsequent site-specific projects may still be authorized under the umbrella of the MDP, acceptance of the MDP and amendment of the SUP was the consummation of the agency's decision-making process and it determined legal rights and obligations.  Therefore, the Forest Service engaged in final agency action that is reviewable under the APA.

**Brief of Amicus Curiae** - 10

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

C.    The Forest Service's acceptance of the Master Development Plan and amendment
of the Special Use Permit triggers National Environmental Policy Act review

NEPA mandates the preparation of an Environmental Assessment or an Environmental

Impact Statement (EIS) for major federal actions significantly affecting the quality of the human

environment.  42 U.S.C. § 4332(2)(C).  Importantly, "major federal actions" are not limited to

ground disturbing events.  Instead, NEPA is implicated when there is an "[a]doption of formal

plans, such as official documents … approved by federal agencies which guide or prescribe

alternative uses of Federal resources, upon which the agency actions will be based."  40 C.F.R. §

1508.18(b)(2).  Here, each component is satisfied for the MDP acceptance and SUP amendment.

First, the MDP and SUP are "formal plans" that identify the allowable scope of the development

at the ski area.  AR 9885.  Second, it is undisputed that the MDP entails the use of federal

resources.  Third, because the MDP acceptance and SUP amendment set forth the allowable

scope of development at the ski area, subsequent site-specific projects will be based upon the

new MDP and amended SUP.

For acceptance and amendment, the Forest Service followed its special uses screening

criteria at 36 C.F.R. § 251.54.  AR-11260.  Under the screening procedure, those proposals that

meet the screening criteria are subject to NEPA compliance.  36 C.F.R. § 251.54(e)(6).  Only

those proposals that the agency determines that RLK cannot demonstrate technical or economic

feasibility, or for which there is no entity willing to accept responsibility for adherence to

specific terms and conditions, do not constitute "agency proposal[s] as defined in 40 CFR

1508.23," and, therefore, are not subject to NEPA.  *Id.*  Here, the Forest Service evaluated

RLK's MDP pursuant to the screening criteria and made no determination of infeasibility or

unaccountability.  Accordingly, the NEPA process was triggered for acceptance and amendment.

**Brief of Amicus Curiae** - 11

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

The NSAA also cites to *Grand Canyon Trust v. U.S. Bureau of Reclamation,* 691 F.3d 1008, 1022 (9th Cir. 2012), for the proposition that NEPA is "not triggered by the preparation and submittal of 'routine and required' report documents."  ECF No. 142-1 at 13.  Here, the MDP does not resemble the annual operating plans at issue in *Grand Canyon Trust*.  Such annual operating plans are issued yearly, and they merely describe "the operation of the [Glen Canyon] Dam for the preceding year 'and the projected year operations undertaken pursuant to the [Grand Canyon Protection Act].'"  *Id*. at 1013.  In other words, in *Grand Canyon Trust*, the issue was what was occurring, not what was permissible.  Here, the MDP identifies the allowable scope of development for a ten-year period, but, without NEPA, no public participation is required.  The one-year annual operating procedure at issue in *Grand Canyon Trust*, on the other hand, require, pursuant to statute, consultation "with members of the general public, including academics and scientists, environmental organizations, the recreation industry, and purchasers of Federal power generated by the Dam."  *Id*. at 1013.  Regardless of the greater protections afforded under the one-year operating plan in *Grand Canyon Trust* than the ten-year MDP at issue here, the Ninth Circuit in *Grand Canyon Trust* determined that NEPA was not triggered because:

> The time for an agency to give a hard look at environmental consequences … should come in this context at the points where an agency establishes operating criteria for a dam, or embarks on some significant direction in operating policy, not merely when there is routine and required annual reporting.

*Id.* at 1022.  The acceptance of the MDP and amendment of the SUP is just that:  a document that sets the "direction in operating policy."  The MDP acceptance and SUP amendment identifies the allowable scope of operations.  Therefore, while it is true that "routine and required" reporting documents do not trigger NEPA, the ten-year MDP at issue here is far from routine, contains no

**Brief of Amicus Curiae** - 12

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5*[th] *Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

requirement to consult with the public or other stakeholders absent NEPA review, and is plainly

distinguishable from the annual operating plan at issue in *Grand Canyon Trust*.

The NSAA next argues that, "as a policy matter in the years after the examples Plaintiffs

identify, the Forest Service decided to treat MDPs as conceptual plans rather than as proposals

for action that are subject to NEPA." ECF No. 142-1 at 9. The NSAA is attempting to justify

the agency's change in policy by arguing that the Forest Service "provides the requisite

'awareness that [the agency] is changing position,' 'that there are good reasons for it, and that the

agency believes it to be better, which the conscious change of course adequately indicates.'" *Id.*

(citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Reliance on *Fox

Television Stations*, however, is misplaced. For the agency's allegedly conscious change in

position, the NSAA points to a litigation memorandum (AR-10881) prepared after resolution of

the *Ark Initiative* case. That memorandum simply summarizes the limited holding in *Ark

Initiative*, and refers to "key points." At no point does the legal memorandum refer to an official

change in position from past practices sufficient to satisfy the standard for an agency's change in

position, as articulated in *Fox Television Stations*, which requires that the agency is aware "it *is*

changing position" and that there are "good reasons for the new policy." *Id.* at 515. Here,

satisfaction of that criteria is simply absent from the record.

Along these same lines, the NSAA's reliance on the legal memorandum highlights an

internal inconsistency in the NSAA's argument. On the one hand, the NSAA argues that prior

MDPs were always accompanied by authorization of a site-specific project or on-the-ground

activities, and that this was legally determinative of the issue whether to prepare NEPA. ECF

No. 142-1 at 8. On the other hand, the NSAA argues that there was a conscious and articulated

**Brief of Amicus Curiae** - 13
*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

change in the agency's position under *Fox Televisions Stations*.  Simply put, the NSAA cannot

both argue that NEPA review occurred only when MDPs were accompanied by site-specific

implementation and, at the same time, argue that there was a change in the agency's policy to no

longer require NEPA review for MDP acceptance and SUP amendment.

In any event, the NSAA is incorrect that previous master planning on Mt. Hood subject to

NEPA was always accompanied by site-specific authorizations.  The NSAA asserts erroneously

that the FEIS and ROD at issue in *Friends of Mt. Hood* "authorized action."  ECF No. 142-1 at 9.

In fact, as the 1997 FEIS establishes, the Forest Service considered five alternatives for

"conceptual development."  AR-5653.  The decision would "conceptually authorize a new

Master Plan for the [Meadows] Ski Area . . . ."  *Id.*  The agency made clear that

"[i]mplementation [would] require additional site-specific environmental analyses pursuant to

NEPA requirements."  *Id.*  The NSAA's argument to the contrary is misplaced.

Finally, if the Forest Service wanted to exclude MDP acceptance and SUP amendment

from NEPA review, the appropriate avenue for doing so is to pursue notice and comment

rulemaking to categorically exclude such matters.  To illustrate this point, the Forest Service

categorically excludes amendments to SUPs that involve only "administrative changes."  *See* 36

C.F.R. § 220.6(d)(10) ("Amendment to or replacement of an existing special use authorization

that involves only administrative changes and does not involve changes in the authorized

facilities or increase in the scope or intensity of authorized activities, ….").  Here, however, the

MDP acceptance and SUP amendment include the wholesale expansion of authorized uses, and,

therefore, NEPA review should have been triggered.

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

III.    The Forest Service should prepare an Environmental Impact Statement for the bike
        facility project because it may result in significant environmental effects

    A.    An Environmental Impact Statement is required because the Project may have
          significant environmental effects according to a single significance factor or a
          combination of significance factors under the National Environmental Policy Act

NEPA requires that all government agencies prepare an EIS when a proposed federal

action may "significantly affect[ ] the quality of the human environment."  42 U.S.C. §

4332(2)(C).  The requirement for an EIS is not reserved for those instances where environmental

effects *will* occur.  Instead, "the significant effect need not actually occur; it is sufficient to

trigger the preparation of an EIS if a substantial question is raised 'whether a project may have a

significant effect on the environment."  *Cascadia Wildlands v. U.S. Forest Serv.*, 937 F.Supp. 2d

1271, 1280 (D. Or. 2013) (quoting *Blue Mountains Biodiversity Proj. v. Blackwood*, 161 F3d

1208, 1212 (9th Cir. 1998)).

        "If an agency moves forward without issuing an EIS, the agency must provide a

'convincing statement of reasons' to support why the proposed project is not significant; this

explanation is critical in demonstrating that the agency took the requisite 'hard look' at the

potential environmental effects of a project."  *Cascadia Wildlands*, 937 F.Supp. 2d at 1280.  In

determining whether potential effects are significant, agencies and courts must evaluate their

"context" and "intensity."  40 C.F.R. § 1508.27.  In assessing the intensity, or the 'severity of the

impact,' courts and agencies should consider up to ten factors.  40 C.F.R. § 1508.27(b).  A court

may find a substantial risk of significant effect based on just one of these factors, *Ocean*

*Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2004), but this Court has

previously found that, "when considered individually, several of the factors might not require an

EIS.  However, when considered together, they do."  *Oregon Wild v. Bureau of Land Mgmt,*

**Brief of Amicus Curiae** - 15                    *Sean T. Malone, Attorney At Law*
                                                   *259 E. 5th Ave., Ste 200-G*
*Bark, et al. v. Northrop et al.,*                 *Eugene OR 97401*
Case No. 3:13-cv-828-AA                            *Tel. (503) 525-2727*

Case No. 14-0110-AA, 2015 U.S. Dist. LEXIS 32584, *32 (March 14, 2015); *Cascadia Wildlands*, 937 F.supp.2d at 1283-84 ("when considered individually, none of these significant factors might require an EIS.  However, when considered collectively, they do.").  Thus, while one factor may not be enough to show the potential for significant environmental impacts, several factors in the aggregate may be enough to require preparation of an EIS.

Plaintiffs argued that an EIS must be prepared because (1) the Project may have environmental effects that are controversial, ECF No. 118 at 15 n 21, 17, 26, 27; (2) the possible effects on the human environment are highly uncertain or involve unique or unknown risks, id. at 15 n 21, 16, 21; and (3) the Project may adversely affect an endangered or threatened species or its critical habitat, ECF No. 118 at 15, 21-22.  Because the bar for preparation of an EIS is sufficiently low to allow for the possibility of significant effects, an EIS should be prepared under any single intensity factor or a combination of intensity factors.

1.    The Project may be significant because of controversial environmental impacts

A project qualifies as likely to be highly controversial if a "substantial dispute exists as to [its] size, nature, or effect.  *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1536 (9th Cir. 1997).  Mere public opposition to a proposal does not render it highly controversial.  *Id.*  Rather, a "substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI casts a serious doubt upon the reasonableness of an agency's conclusions." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001).

Here, the Project is highly controversial because of the impacts on LCR steelhead.  First, as an example of the substantial dispute as to the effect of the Project, the National Marine Fisheries Service (NMFS) changed its position from a letter of concurrence to a full biological

opinion. NMFS originally concurred with the Forest Service's determination that the Project was not likely to adversely affect LCR steelhead, AR-23464-85, but then changed course to prepare a biological opinion, NMFS 727-99. In that biological opinion, NMFS identified adverse effects from the Project, NMFS 770, and issued an Incidental Take Statement authorizing the "take" of LCR steelhead. The agency's change in position is evidence itself of controversy within the agency about the Project's effects.

Moreover, hydrologist Jonathan Rhodes[4] found that "[e]levated sediment delivery also increases turbidity which degrades water quality and can adversely affect salmonids," AR 29067, and the Forest Service concedes that sedimentation could result in catastrophic and chromic impacts: "Road-related landslides, surface erosion, and stream channel diversions often deliver large quantities of sediment to streams, both catastrophically during large storms and chronically during smaller runoff events." AR 27802. This catastrophic and chronic sedimentation is compounded by the Project EA's failure to properly assess the impacts of the project on erosion and sediment delivery. *See* AR-29052-59, 21070-72 (Rhodes' comments, noting that project "fails to properly describe the nature of the proposed alternative with respect to levels of disturbance); 21073-75 (noting that the project fails to "properly describe the impacts of the proposed alternative on [Riparian Reserves] and their functionality); 21075-78 (Project fails to "properly assess the impacts of the proposed action on sediment delivery); 21079-80 (Project fails to "properly assess the impacts of the proposed action on stream-route connectivity and

---

[4] Jonathan Rhodes' "professional experience includes more than 12 years at the Columbia River Inter-Tribal Fish Commission (CRITFC), where [he] served as Senior Scientist-Hydrologist. [Mr. Rhodes] also ha[s] more than eight years [of] experience working as an independent consultant for tribal, federal, state, county and city governments, universities, homeowners associations, and non-profit groups in eight western states. AR-21069

**Brief of Amicus Curiae** - 17

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

resulting effects on peak flows and stream network extension"); 21081-82 (Project's "assessment

of cumulative effects on aquatic resources is highly defective").  A professional hydrologists'

extensive report in the aforementioned citations disputing the size of the impacts constitutes

evidence casting doubt on the reasonableness of the agency's decision not to prepare an EIS.

> 2.    The Project may be significant because the possible effects on the human
> environment are highly uncertain or involve unique or unknown risks

Plaintiffs argued that the Forest Service failed to properly consider "the degree to which

the possible effects . . . are highly uncertain or involve unique or unknown risks."  40 C.F.R. §

1508.27(b)(5).  "The purpose of an EIS is to obviate the need for speculation by insuring that

available data are gathered and analyzed prior to the implementation of the proposed action."

*Nat'l Parks & Conservation Ass'n*, 241 F.3d at 732-33.  "[T]he hard look must be taken before,

not after, the environmentally-threatening actions are put into effect."  *Id.*

Here, the Project includes uncertain mitigation measures in an attempt to reduce the

overall effect of the project.  Despite the fact that mitigation is not to be used as a "substitute for

preventing habitat degradation," SUPP-1373 and AR-29050, the Forest Service nonetheless

proposed uncertain mitigation measures.  The agency's allegation that adverse environmental

effects would be "fully offset through project design measures" (AR 28086) or would

"completely restore … riparian reserves" (AR 29314) must be substantiated under NEPA.  *See S.*

*Fork Band Council of W. Shoshone v. U.S. DOI*, 588 F.3d 718, 727 (9th Cir. 2009) ("An

essential component of a reasonably complete mitigation discussion is an assessment of whether

the proposed mitigation measures can be effective"); *Okanogan Highlands Alliance v. Williams*,

236 F.3d 468, 477 (9th Cir. 2000) (upholding an EIS where "[e]ach mitigating process was

evaluated separately and given an effectiveness rating").  The Ninth Circuit has been clear that

**Brief of Amicus Curiae** - 18

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

"conclusory assertions" and the agency's "word" should neither be accepted nor given "deference." *See Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1137 (9th Cir. 2011) ("In essence, the agencies would like this court to take their word for it and not question their conclusory assertions in the EA .... Their word, however, is not entitled to the significant deference that courts give [agency methodologies].").

The record contradicts the conclusory assertions of the agency that restoration would fully offset environmental impacts. Restoration in "areas at higher elevation with thin topsoil, short growing seasons, and low soil productivity" have "an extremely high rate of failure." AR 21071. Indeed, the record is replete with past restoration failures that call into question the agency's restoration proposals here. *See* FS 2nd Supp 292-294 (describing the failure of prior restoration efforts on the Mt. Hood national forest); FS 2nd Supp 298, 300-303, 306, 307 (photographs of prior restoration failures); FS 2nd Supp 702-721 (Assessment of Effectiveness of Restoration Activities Post-Implementation – Timberline Proposed Bike Park, by Jonathan Rhodes, Hydrologist). The Forest Service has not demonstrated that the restoration efforts proposed for this Project would not suffer the same fate as other such efforts. *See* AR-29047 ("There are no reliable data indicating that BMPs consistently reduce the adverse effects of roads on aquatic resources to ecologically negligible levels, especially within the context of currently pervasive and aquatic degradation, as numerous scientific assessments, including those of the USFS, have repeatedly noted (Ziemer and Lisle, 1993; Espinosa et al., 1997; USFS and USBLM, 1997; Beschta et al., 2004; GLEC, 2008).").

**Brief of Amicus Curiae** - 19
*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

3.    The Project may be significant because the Project may adversely affect LCR steelhead

Plaintiffs also argued that an EIS should be required because of "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." 40 C.F.R. § 1508.27(b)(9). "Courts have held that 'a project need not jeopardize the continued existence of a threatened or endangered species to have a 'significant' effect for the purposes of NEPA." *Cascadia Wildlands*, 937 F.supp.2d at 1282. In *Envtl. Ethics v. U.S. Forest Serv.*, 451 F.3d 1005, 1012 (9th Cir. 2006), the Ninth Circuit recognized that species viability is the relevant standard for assessing a project under the Endangered Species Act, but the standard is adverse effects under NEPA.

Here, "[t]he Sandy River population of LCR steelhead shows very low abundance" and the population is precarious given that it is at "high risk of extinction. NMFS_748. The Biological Opinion issued by NMFS identified adverse effects to LCR steelhead, NMFS 770, and NMFS issued an incidental take statement. NMFS 773. Combined with the above-referenced controversy and the uncertainty surrounding the efficacy of restoration activities, the record demonstrates that LCR steelhead, a listed a species, will be adversely affected. Therefore, according to any single significance factor or a combination of the significance factors, an EIS should be prepared to address the potential for significant environmental impacts.

CONCLUSION

Amicus Curiae Mazamas respectfully requests that this Court grant Plaintiffs' motion for Summary Judgment.

**Brief of Amicus Curiae** - 20

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*

Respectfully submitted this 16th day of June 2015,

/s/ Sean Malone
SEAN MALONE (OR Bar #084060)
Attorney at Law
259 E.5th Ave, Ste200-G
Eugene, OR 97401
Tel: (303) 859-0403
Fax: (650) 471-7366
seanmalone8@hotmail.com

CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2015, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to all parties.

s/ Sean T. Malone
Sean T. Malone
Attorney for Amicus Curiae

**Brief of Amicus Curiae** - 21

*Bark, et al. v. Northrop et al.,*
Case No. 3:13-cv-828-AA

*Sean T. Malone, Attorney At Law*
*259 E. 5th Ave., Ste 200-G*
*Eugene OR 97401*
*Tel. (503) 525-2727*