UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

BARK, an Oregon non-profit corporation,
FRIENDS OF MOUNT HOOD, an Oregon
non-profit corporation, NORTHWEST
ENVIRONMENTAL DEFENSE CENTER,
an Oregon non-profit corporation, and
SIERRA CLUB, a California non-profit
corporation,

          Plaintiffs,

    v.

LISA NORTHROP, Acting Forest Supervisor
of the Mt. Hood National Forest, BILL
WESTBROOK, Zigzag District Ranger,
KENT CONNAUGHTON, Regional Forester
for Region 6, and the UNITED STATES
FOREST SERVICE, a federal Agency;
WILLIAM STELLE, Regional Director of the
West Coast Region, and the NATIONAL
MARINE FISHERIES SERVICE,

          Defendants,

RLK AND COMPANY, an Oregon
corporation,

          Defendant-Intervenor.

Case No. 3:13-cv-00828-AA
OPINION AND ORDER

———————————————————

Oliver J. Stiefel
Ralph O. Bloemers
Christopher G. Winter
Crag Law Center
917 S.W. Oak Street, Suite 417
Portland, Oregon 97205
    Attorneys for plaintiffs

1 – OPINION AND ORDER

Sean E. Martin
Stephen J. Odell
Assistant United States Attorneys
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204
    Attorneys for defendants

Erika E. Malmen
Robert A. Maynard
Perkins Coie, LLP
1111 W. Jefferson Street, Suite 500
Boise, Idaho 83702
    Attorneys for defendant-intervenor

AIKEN, Judge:

    Plaintiffs filed suit under the Administrative Procedures Act (APA), alleging violations of the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), and the Endangered Species Act (ESA) by defendants United States Forest Service (the Forest Service) and National Marine Fisheries Service (NMFS). Plaintiffs' claims arise from the Forest Service's approval of the Timberline Ski Area Mountain Bike Trails and Skills Park (the Project) and NMFS' issuance of a Biological Opinion and Incidental Take Statement regarding the Project's effects on Lower Columbia River Steelhead. Plaintiffs ask that the court set aside the federal agencies' decisions and enjoin the Forest Service from implementing the Project until the agencies comply with NEPA, NFMA, and the ESA. The Forest Service and NFMS deny plaintiffs' claims and maintain that their decisions are supported by the record and entitled to deference.

    The parties, including defendant-intervenor RLK and Company (RLK), filed cross-motions for summary judgment on plaintiffs' claims. A mountaineering educational organization, Mazamas, filed an amicus brief in support of plaintiffs' motion, and the National Ski Areas Association and the Northwest Trail Alliance, Inc., each filed an amicus brief in support of the federal agencies' and RLK's motions. The parties also filed competing motions to strike alleged extra-record evidence and declarations.

2 – OPINION AND ORDER

On November 9, 2015, the court heard oral argument.[1] Subsequently, NMFS and the Forest

Service reinitiated consultation under the ESA regarding the Project's effects on the Lower Columbia

River Steelhead. In response to an inquiry from the court, defendants concede that the parties' motions

should be stayed with respect to plaintiffs' claims associated with the steelhead until ESA consultation

is complete. Plaintiffs disagree and argue that the court should proceed and resolve all claims. RLK

takes no position on a stay, though it contends that the court should require the Forest Service and

NMFS to complete consultation by March 31, 2016 or provide a status report on that date. For the

reasons explained below, this opinion is limited to the parties' motions for summary judgment on

plaintiffs' NEPA and NFMA claims that are not implicated by the reinitiation of consultation; the

motions are stayed with respect to plaintiffs' ESA and NEPA supplementation claims.

## BACKGROUND

Mt. Hood, Oregon's tallest mountain, lies within the Mt. Hood National Forest (the

Forest). The Forest is comprised of more than one million acres, one third of which constitute

designated wilderness areas. The Forest includes more than 5000 miles of streams and approximately

1300 miles of recreational trails and provides habitat to an array of species, including deer, elk, fish,

and migratory birds. The Mt. Hood Forest Land Resource Management Plan (LRMP) governs

management of the Forest, including the implementation of recreational projects.

Located on the slopes of Mt. Hood is the Timberline Lodge and the Timberline Ski Area. The

---

[1]The transcript for the oral argument was prepared and docketed on January 12, 2016. Shortly
thereafter, RLK moved to correct the transcript. Essentially, RLK quibbles over a handful of words it
contends were transcribed incorrectly. Notably, oral argument lasted over three hours and involved
numerous case citations and technical terms, and I commend the court reporter for her effort and
accuracy. RLK provides no evidence, other than handwritten notations, to show that the identified
words were transcribed incorrectly; it is entirely plausible that RLK's counsel simply misspoke or
failed to enunciate or project his voice. Nonetheless, based on a review of the alleged errors and a
comparison with the audio recording, the court grants the motion (doc. 186) in part. The transcript
shall be corrected as follows: the word "areas" shall be changed to "years" on page 85, line 4, and the
word "knows" shall be changed to "acknowledged" on page 88, line 23. The motion is denied in all
other respects, as the audio recording does not clearly indicate that the transcription is incorrect.

Timberline Lodge is a National Historic Landmark dedicated in 1937 and is a destination for visitors who seek to enjoy recreational activities within the Forest. Timberline Ski Area (Timberline) is owned and managed by RLK, who operates ski facilities under a Special Use Permit (SUP) issued by the Forest Service. The Timberline SUP area includes land designated as part of the A-11 Winter Recreation Management Area. Pursuant to the LRMP, the characteristics and goals of this management area include recreational activities such as skiing, hiking, mountain bicycling, and horseback riding.

In 2008, the Forest Service issued RLK its current thirty-year SUP for the Lodge. The following year, as required by the SUP, RLK submitted its Timberline Conceptual Master Plan (CMP) with proposed changes to its Master Development Plan (MDP). AR 9884, 10857-80. The proposed changes reflect RLK's "vision" for future development in the Timberline SUP area. AR 10859. RLK's initial CMP included plans for a new day lodge, with an adjacent snow tubing hill and parking lot. AR 10861. The Forest Service accepted RLK's proposed CMP and recognized it as "an update" to the MDP. AR 10882. The Forest Service noted that its "acceptance of the MDP does not convey [the agency's] approval of any of the projects within the document." *Id.* Rather, the Forest Service advised that prior "to authorization, the appropriate environmental analysis required by [NEPA] will need to be completed for each project." *Id.*

In December 2009, RLK requested an amendment to the CMP to reflect its "interest in offering lift-accessed, downhill mountain biking on bike trails served by the Jeff Flood chairlift." AR 11215. The Forest Service accepted RLK's request as another update to the MDP. Again, the Forest Service stated that "acceptance of the MDP does not convey approval of bike trails that we have discussed" and informed RLK that such projects "will be subject to NEPA review and analysis." AR 11333.

In January 2010, RLK submitted its initial proposal for the Project to the Forest Zigzag Ranger District. AR 11221. The proposal included the development and construction of mountain bike trails and a skills park. AR 11223-48. RLK proposed the Project to satisfy public demand for summer

4 – OPINION AND ORDER

mountain biking activities, to meet Mt. Hood LRMP objectives for year-round outdoor recreational opportunities, and to better utilize the existing ski lifts and other infrastructure. AR 11222, 27739.

In June 2010, the Forest Service circulated a scoping letter conveying its intent to prepare an environmental assessment (EA) analyzing the effects of RLK's proposal. AR 11869-73. The Forest Service invited interested parties to attend a "field trip" to the Project site and view the design and placement of the proposed trails. AR 11449-57. The Forest Service also held a public meeting to discuss concerns about the Project. AR 11982-83, 12094-96, 12097. Public comments raised issues about consistency with LRMP standards, NEPA review of the MDP, and potential erosion and damage to streams and fish habitat. AR 11879-81, 11883, 11897-98.

The Forest Service also assembled an Inter-Disciplinary Team (IDT) to assess RLK's initial proposal. AR 11448-49, 12157, 27750. After review by the IDT, the Forest Service reduced the number of bike trails from twelve to eight and the total acres of ground disturbance from eighteen to twelve; it also rerouted trail segments within Riparian Reserves, drainages, and certain seepage areas.[2] AR 27752-54. The Forest Service further modified the Project's design by limiting the average slope of trails, implementing rolling dips and grade reversals to reduce the speed and aggressive braking of cyclists, and proposing the use of wood and/or rock armoring to protect soil on steep trail segments. AR 27752, 27757. The IDT also developed a comprehensive set of Project Design Criteria (PDC) for to the Project. AR 12035-43, 12157, 27766. The PDC include numerous criteria designed to protect soil resources, vegetation, and watershed resources. AR 27766-78 (Table 3).

Finally, the Forest Service added restoration activities to reduce ongoing sediment from existing sources and to improve the stream drainage network in the Project area. AR 12123-31, 27741, 27762-64. The restoration measures include decommissioning and/or stabilizing approximately two miles of roads and revegetating degraded sites in the Project area. AR 27741, 27754-55, 27762-64.

---

[2]"Riparian reserves are portions of watersheds where riparian-dependent resources receive primary emphasis and where special standards and guidelines apply." AR 27823.

In March 2011, the Forest Service issued a Preliminary Assessment and hosted another open house on the revised proposal. AR 27746. The Forest Service received a substantial number of comment letters, including comments from plaintiffs and their hydrologist, Jonathan Rhodes. AR 21069-91, 21106-49, 27997-28052. In response, the Forest Service completed "a more robust sediment yield analysis" and assessed direct and indirect sediment associated with roads and trails in the area. AR 28016.

On April 7, 2011, the Forest Service requested informal consultation with NMFS regarding the Project's effects on Lower Columbia River (LCR) steelhead. *See* 16 U.S.C. § 1536(a)(2) (action and expert agencies must consult if a project may affect a listed species or its critical habitat). Designated critical habitat for winter runs of the LCR Steelhead are located in the proposed Project area, including Still Creek, designated as a "Special Emphasis" watershed. AR 27822, 27849. The Project area also includes the West Fork Salmon River, designated as a "Tier 1" watershed. AR 27821. The Forest Service concluded in a Biological Assessment (BA) and Biological Evaluation (BE) that the Project could cause some effect to a few individual steelhead and fish habitat but would not likely adversely affect the species. AR 24001, 24059-60, 27706, 27849. NMFS initially concurred with the Forest Service's assessment that the Project "may affect, but is not likely to adversely affect" LCR steelhead and its designated critical habitat. AR 23464-74, NMFS 25-46.

The Forest Service also forwarded a final draft Environmental Assessment (EA) for internal agency review by an Environmental Review Committee (ERC). AR 26259-26504. After considering feedback from the ERC, IDT members finalized their respective specialist reports and made final revisions to the team's analysis. AR 26679-27086, 27373-27406, 27409-27526, 27553-27607, 27608-27627, 27628-27720..

On November 19, 2012, the Forest Service released the final EA and issued a Finding of No Significant Impact (FONSI) and a Decision Notice (DN) approving the Project. AR 27732-28084, 28085-108. Plaintiffs appealed the DN and submitted a declaration from Mr. Rhodes. AR 28153-74.

The Appeal Reviewing Officer recommended that the appeal be denied, and the Regional Forester denied the appeal. AR 29284-89, 29290-29322.

As approved, the Project is a chairlift-assisted mountain biking development with seventeen miles of bike trails and a small skills park within an area designated for managed recreation. *See* AR 27736-27739, 27946, 28084. The Project also includes 2.1 miles of restoration projects. AR 27754, 27762-63. Yearly operations for the bike trail and skills park would begin when snowmelt allows for trail maintenance, generally mid-to-late July, and would cease in the fall or when "soil moisture and the resulting impacts to trail conditions are determined to be sufficient" to dictate cessation of operations. AR 27765. Similarly, construction and/or operation of the Project would cease if more than one-inch of rain falls within a 24-hour time period, or the flow of the nearby Bull Run River exceeds 200 cubic feet per second. AR 27771.

On May 16, 2013, plaintiffs filed their first complaint seeking judicial review of the Forest Service's decision to approve the Project. Subsequently, the parties agreed that the Forest Service would not proceed with construction of the bike trails and the skills park until the court resolved plaintiffs' claims through cross-motions for summary judgment. The parties also agreed that certain restoration activities of the Project could proceed.

In July and August 2013, the Xerces Society for Invertebrate Conservation (Xerces) surveyed meadows on Mt. Hood and located the Western bumblebee, a sensitive species, in the Project area. FS 2ndSupp 272, 282, 887.[3] The Forest Service's wildlife biologist "review[ed] the found locations and consider[ed] this information in regards to the analysis" of the Project. FS 2ndSupp 887. In December 2013, the Forest Service prepared a "New Information Review" regarding the bumblebee. FS 2ndSupp 886-922. The Forest Service determined that the Project "may impact individual[] [bees] or habitat,

---

[3] "'Sensitive species' are those species that are not endangered, but for which there is concern about the viability of their populations." *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 n.1 (9th Cir. 1996).

but will not likely contribute to a trend towards Federal listing or loss of viability of the population or species." FS 2ndSupp 887. The Forest Service nonetheless adopted additional PDC proposed by the wildlife biologist to alleviate several concerns raised by Xerces. *See* FS 2ndSupp 887-88, 894-96.

On December 23, 2013, plaintiffs provided notice of their intent to sue NFMS for ESA violations involving the LCR Steelhead. FS 2ndSupp 317-27; NMFS 133-43. On March 14, 2014, plaintiffs filed a First Amended Complaint and added claims alleging that defendants failed to perform supplemental NEPA analysis for the Western bumblebee and failed to engage in formal consultation with NMFS with respect to the LCR steelhead.

On March 27, 2014, the Forest Service and NMFS initiated formal consultation on the LCR steelhead. FS 2ndSUPP 3861-63. On August 5, 2014, NMFS issued a Biological Opinion (BiOp) concluding that the Project was not likely to jeopardize the continued existence of the LCR steelhead or adversely modify its critical habitat. NMFS 727, 773. However, NMFS found that the Project was likely to adversely affect individual LCR steelhead. NMFS 769-70. NMFS thus mandated terms and conditions for the Project, including sediment control measures, design features to minimize sediment delivery during operations, and pollution and erosion control measures. NMFS 776-80. These terms and conditions largely mirror the Project's PDC included in the EA. Due to the adverse impacts to individual steelhead and specific habitat, NMFS issued an Incidental Take Statement authorizing the "take" of steelhead incidental to the Project. NMFS 773.

On September 18, 2014, the Forest Service issued a New Information Report and concluded that NMFS's discussion of the Project's effects on LCR steelhead was consistent with the effects considered and disclosed in the EA. Thus, the Forest Service found that supplemental NEPA analysis was not required. FS Supp2d 4243-44, 4248-53.

In late 2014, RLK submitted its 2014 Timberline Lodge Bike Park Project Annual Monitoring Report to the Forest Service. FS 2ndSupp 4368-461. According to the report, the majority of the restoration work associated with the Project and included in the DN/FONSI was completed

8 – OPINION AND ORDER

successfully during 2013 and 2014. The Forest Service then issued the "Phase 2 of the Restoration Activities associated with Timberline Ski Area Mountain Bike Trails and Skills Park Progress Report" prepared by a Forest Service fisheries biologist. FS 2ndSupp 4462-64.

On November 20, 2014, plaintiffs filed a Second Amended Complaint alleging that the Forest Service must conduct supplemental NEPA analysis regarding the Project's effects on the LCR steelhead (as well as the Western bumblebee), and that the BiOp and ITS are arbitrary and capricious in violation of the ESA. The parties then proceeded with the instant motions for summary judgment pursuant to a stipulated briefing schedule.

After the court heard oral argument on the motions, defendants informed the court that the Forest Service and NMFS reinitiated consultation after discovering that the riparian disturbance take surrogate identified in the BiOp had been exceeded. Specifically, ground-disturbing activities related to the Project's restoration measures apparently caused ground disturbance of 1.58 acres, which is .04 acres greater than the disturbance area surrogate specified in the BiOp.

In response to inquiry from the court, defendants concede that the reinitiation of consultation warrants a stay of the parties' motions with respect claims associated with the LCR Steelhead and the adequacy of NMFS' BiOp. Plaintiffs disagree with defendants' assessment and contend that no basis exists to support a stay. Plaintiffs emphasize that NMFS has not withdrawn its BiOp or indicated that it will issue a new one, and that the possibility of mootness should not deter the court from resolving the parties' motions. I disagree. The renewed consultation raises the specter that NMFS will issue a new or revised BiOp, thus rendering moot plaintiffs' ESA claims and providing additional information to consider in the context of plaintiffs' NEPA supplementation claims. Moreover, the Forest Service may reevaluate its conclusions in light of a new BiOp, and the court is not inclined to issue factual findings and legal conclusions that ultimately become advisory. Nonetheless, I find that the reinitiation of consultation should not delay ruling on plaintiffs' claims unrelated to those involving the LCR Steelhead, as discussed below.

9 – OPINION AND ORDER

## DISCUSSION

A federal agency's compliance with NEPA and NFMA is reviewed under the APA. 5 U.S.C. § 706. Plaintiffs also seek review of their ESA claim under the APA. *See* Sec. Am. Compl. at 69. Under the APA, a court may set aside final agency action if, after reviewing the administrative record, the court determines that the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Natural Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 877 (9th Cir. 2005) (quoting 5 U.S.C. § 706(2)(A)). Review under this standard is narrow, and the court "may not substitute its judgment for that of the agency regarding environmental consequences of the agency's actions." *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 573 (9th Cir. 1998). Nevertheless, while the scope of review under this standard is narrow, the court must "engage in a substantial inquiry . . . a thorough, probing, in-depth review." *Native Ecosys. Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (citation omitted). Generally, the court will reverse an agency's decision as arbitrary or capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In order to withstand summary judgment, the agency "must articulate a rational connection between the facts found and the conclusions reached." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1023 (9th Cir. 2007) (citation omitted); *see also Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (courts examine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment").

A.  NEPA Claims

Plaintiffs move for summary judgment on three NEPA claims: 1) the failure to conduct NEPA analysis for RLK's MDP; 2) the failure to prepare an EIS for the Project; and 3) the failure to

conduct supplemental NEPA analysis regarding the Project's effects on LRC steelhead and the Western bumblebee. This opinion does not discuss the Forest Service's alleged failure to conduct supplemental NEPA analysis on the Project's effects, because plaintiffs' claim regarding the LCR Steelhead could be rendered moot if NFMS issues a supplemental BiOp and the court prefers not to address the supplemental NEPA claim in piecemeal fashion.

"NEPA requires federal agencies to examine and disclose the environmental impacts of their proposed actions." *Pac. Coast Fed'n of Fishermen's Ass'n v. Blank*, 693 F.3d 1084, 1088 (9th Cir. 2012); *see also* 42 U.S.C. § 4332. These dual objectives ensure that agencies "consider every significant aspect of the environmental impact of a proposed action" and "inform the public that it has indeed considered environmental concerns in its decision making process." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983); *see also Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (NEPA exists "to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action").

Importantly, "NEPA is a procedural statute that does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Sierra Club*, 510 F.3d at 1018 (citation and internal quotation marks omitted). The court's role is to determine whether the agency took the requisite "hard look" that NEPA demands and provided "a reasonably thorough discussion" of the probable, significant environmental consequences of the proposed action. *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).

### 1. Failure to Conduct NEPA Analysis for the MDP

RLK's MDP, as updated by the CMP, includes plans for a new parking lot, day lodge, tubing area, mountain biking trails, and the skills park. AR 10861, 11215. The agency accepted the updated MDP and made it a part of RLK's SUP. AR 10882, 11333. Plaintiffs allege that acceptance of the

11 – OPINION AND ORDER

MDP constituted a "major federal action" subject to NEPA analysis. *See* 40 C.F.R. § 1508.18(b)(2)
("Major federal actions" include "[a]doption of formal plans such as official documents prepared or
approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon
which future agency actions will be based"). Plaintiffs assert that the Forest Service expanded the
scope of facilities permitted under the SUP when it accepted RLK's updated MDP and therefore
defined RLK's legal right to develop projects identified in the MDP. *See* AR 9985 ("Nothing in this
permit shall be construed to imply permission to build or maintain any improvement not specifically
named in the MDP."). Plaintiffs further contend that the Forest Service previously analyzed the
impacts of MDPs for Timberline and other Mt. Hood ski projects, but it "changed course and accepted
the MDP without any public involvement." Pls.' Mem. in Supp. at 5. Plaintiffs thus argue that the
Forest Service violated NEPA by failing to solicit public comment and analyze the effects of RLK's
MDP.

The Forest Service responds that the "acceptance" of the MDP does not constitute "approval"
for projects identified.[4] The Forest Service emphasizes that its acceptance advised: "Please note that
the Forest Service acceptance of the MDP does not convey our approval of any of the projects within
the document. Prior to authorization, the appropriate environmental analysis required by the National
Environmental Policy Act will need to be completed for each project." AR 10882.

Under the APA, the court's review is limited to "final agency action." 5 U.S.C. § 704. To be
"final," an agency action must mark "the consummation of the agency's decision making process" and

_____

[4]Since 2009, the Forest Service has taken the position that "NEPA reviews should not be done
to 'approve' a MDP," because "acceptance of a MDP is simply a conceptual agreement" and "does not
allow any project to be implemented, or authorize any on-the-ground work." AR 10881. Instead,
"site-specific NEPA should be done on groups or phases of projects that are ripe for implementation."
*Id.* The Forest Service takes the same view with respect to ski area projects, emphasizing that proposed
ski area projects should first be "identified in an accepted Master Development Plan before initiating
an appropriate level of review" under NEPA. AR 26249.

12 – OPINION AND ORDER

constitute an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted); *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 925 (9th Cir. 1999). NEPA also requires agencies to consider the cumulative effects of final actions and "reasonably foreseeable future actions," which are defined as "Federal or non-Federal activities not yet undertaken, for which there are existing decisions, funding, or identified proposals." 36 C.F.R. § 220.3; *League of Wilderness Defenders/Blue Mtns. Biodiversity Proj. v. Connaughton*, 752 F.3d 755, 762 (9th Cir. 2014).

I find that the Forest Service has not determined RLK's legal rights or obligations under the MDP or vested RLK with any rights. The MDP, as updated through the CMP, simply identifies RLK's "vision" for future Timberline developments. AR 10859. The MDP states that it is "conceptual in nature" and that "[s]ubsequent approval of individual project components will be required" under NEPA. AR 10860. Aside from the Project, RLK has presented no other development proposal to the Forest Service for approval; if RLK presents a concrete proposal in the future, the Forest Service will conduct the relevant NEPA analysis and decide whether to authorize the proposal.

The Forest Service simply has made not made a binding commitment that would allow RLK to proceed with any other Project in the MDP. Therefore, the Forest Service's acceptance of the MDP is not a "final agency action" within the meaning of the APA. *See Jayne v. Sherman*, 706 F.3d 994, 1008 (9th Cir. 2013) (rejecting claim that the Forest Service should have conducted NEPA analysis for potential future mining operations, finding that the agency had not made "an irreversible and irretrievable commitment" of resources and would conduct NEPA analysis for future site-specific projects "at the time the proposal is made") (per curiam; adopting district court opinion); *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998) (holding that Forest Service/BLM management program did not require NEPA analysis; NEPA does not require an agency to consider the environmental effects of "speculative or hypothetical projects"); *see also Ark Initiative v. U.S. Forest Serv.*, 2010 WL 3323661 at *6 (D. Colo. Aug. 18, 2010), *aff'd* 660 F.3d 1256 (10th Cir. 2011)

13 – OPINION AND ORDER

("acceptance" of ski area master plan amendment was not a "consummation of the agency's decision-making process" and "did not contain any binding decisions or commitments that would have an immediate impact on the physical environment").

Moreover, aside from the Project, any other project envisioned under the MDP is not a "major federal action" that is reasonably foreseeable; it is speculative, at best. A reasonably foreseeable future action is an "identified proposal" where "the agency 'has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated.'" *League of Wilderness Defenders*, 752 F.3d at 762 (quoting 36 C.F.R. § 220.4(a)(1)). "Although projects need not be finalized before they are reasonably foreseeable, they must be more than merely contemplated." *Id.* (internal citations and quotation marks omitted).

Here, the Forest Service has not articulated any goal and is not actively engaged in a decision-making process about any other MDP project. Further, the precise parameters of the MDP projects have not been proposed, and their effects could not be effectively or efficiently assessed. As the Forest Service noted in the DN:

> The MDP includes a potential parking area and lodge in the vicinity of the Molly's Express bottom terminal. I have evaluated this potential project in relation to the bike park proposal and I have found that the bike park and potential parking lot each have independent utility (i.e., they are not connected actions). The parking lot concept is still being evaluated for feasibility and has not been proposed by RLK as an actual project (i.e., it is not reasonably foreseeable), and as a result, sufficient information does not exist regarding the scope and scale of the parking lot to assess whether its environmental effects would overlap in space and time with the effects of the bike park. Consistent with my review of the MDP, the EA has not identified any cumulative effects associated with the MDP.

AR 28089. Indeed, RLK has not submitted concrete proposals for a parking lot, lodge, or tubing hill, and no decisions have been made about the timing, scope, size or any other aspect of these facilities. *See Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 1000 (9th Cir. 2013) (agency did not fail to analyze the cumulative impacts of the challenged mining project, despite plans to widen scope of future mining, because the project plans were speculative and not "reduced to specific proposals").

14 – OPINION AND ORDER

I agree with the Forest Service that performing NEPA analysis for RLK's MDP would be ineffective and unnecessary, because the Forest Service has no quantified or detailed information to meaningfully review and is not preparing to make a decision on whether to approve other Timberline projects. *Jayne*, 706 F.3d at 1008; *Envtl. Protection Info. Ctr. v. U.S. Forest Serv. (EPIC)*, 451 F.3d 1005, 1015 (9th Cir. 2006) (Forest Service did not arbitrarily and capriciously fail to analyze a timber sale when the "parameters" of the sale "were unknown at the time of the EA"); *see also Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 431 (10th Cir. 1996) ("[R]equiring a cumulative EIS analyzing possible future actions postulated in a twenty-year Master Plan that are far from certain would result in a gross misallocation of resources, would trivialize NEPA and would diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment.") (citation and quotation marks omitted). In this case, NEPA analysis of RLK's MDP would waste scarce resources and provide little in the way of meaningful analysis.

Plaintiffs nonetheless argue that the Forest Service previously conducted NEPA analysis for an update to the Timberline MDP, and that this Court previously found MDP acceptance to be final agency action requiring NEPA analysis. AR 5910; *Friends of Mt. Hood v. U.S. Forest Serv.*, 2000 WL 1844731 (D. Or. Dec. 15, 2000). Notably, the earlier update of the MDP involved an amendment to the LMRP and site-specific decisions. AR 5909-10. Likewise, in *Friends of Mt. Hood*, the Forest Service issued an EIS and Record of Decision amending the Mt. Hood LRMP and authorizing a new Master Plan intended to expand the Mt. Hood Meadows ski area. 2000 WL 1844731, at *1-2. Here, the Forest Service did not evaluate or authorize any other action or plan aside from the Project. Not only are the facts of *Friends of Mt. Hood* distinguishable,[5] the court there did not discuss whether acceptance of a

---

[5]The proposed Master Plan in *Friends of Mt. Hood* initially included: "(1) conversion from a day-use ski area to a full-season regional destination resort with a maximum capacity of 15,000 persons at one time ("PAOT"); (2) 500 units of housing in phases of no more than 250 units; (3) expansion of the permit area by 700 acres to provide downhill skiing in the White River area; (4) replacement of some existing lifts with higher capacity lifts and construction of five new lifts; (5)

conceptual plan, standing alone, was a final agency action ripe for judicial review. In fact, the court found that the agency's renewal of a SUP was not ripe, because it did not "authorize any action." *Id.* at *6. Therefore, *Friends of Mt. Hood* has no application to the facts of this case.

Plaintiffs' reliance on *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072 (9th Cir. 2011) is similarly unavailing. There, the Department of Energy designated areas as national interest electric transmission corridors (NIETCs). The designation of a NIETC made "available a fast track approval process to utilities seeking permits for transmission lines within the corridor." *Id.* at 1080. The Ninth Circuit found the designations to be a "major federal action" within the meaning of NEPA, even though the designations did not "direct any immediate ground-breaking activity." *Id.* at 1098. The Ninth Circuit emphasized that the NIETCs "establish the boundaries for two national electric transmission corridors, ... create 'National Interest' corridors to address national concerns, ... cover over a 100 million acres in ten States... [and] create new federal rights, including the power of eminent domain, that are intended to, and do, curtail rights traditionally held by the states and local governments." *Id.* at 1100-01. The MDP at issue here, involving three potential site-specific proposals in a confined SUP area, does not remotely compare to the NIETCs at issue in *Cal. Wilderness*.

Finally, plaintiffs point out that all parties benefit when a conceptual plan is subjected to NEPA review, because the public is not "surprised" when a party subsequently seeks agency approval for a project included in the plan. However, as noted by the National Ski Areas Association, "more NEPA analysis is not necessarily better" if an agency expends scarce resources to review hypothetical projects "that may never be proposed or authorized." Nat'l Ski Areas Ass'n Brief at 3. Moreover, whether agency analysis and public review of a MDP is beneficial, desirable, or practical is not the issue before the court; the issue is whether NEPA compels review of RLK's MDP. It does not.

---

construction and year-round operation of a mid-mountain restaurant; and (6) expansion of the permit area by 96 areas for additional groomed nordic skiing in the Hood River Meadows area." 2000 WL 1844731 at *2. The Forest Service apparently authorized variations of these proposals. *Id.*

In sum, aside from the Project at issue, the Forest Service has not taken final action with respect to a reasonably foreseeable project identified in RLK's MDP, and it is not required to perform NEPA analysis for the MDP.

### 2. Failure to Prepare an EIS for the Project

Plaintiffs next argue that the Forest Service failed to prepare an EIS for the Project, despite the significant effects of increased sediment in watershed areas and the resulting impacts on LCR steelhead. Plaintiffs contend that the Forest Service erroneously and irrationally found that the proposed mitigation and restoration measures would offset the Project's effects and render them insignificant, even though available data shows that restoration measures are often ineffective and unsuccessful.

Under NEPA, federal agencies must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). To determine whether the proposed action's effects may be significant, the agency prepares an EA, a "concise public document" that provides an agency's analysis of the proposed action. 40 C.F.R. § 1508.9(a).[6] If the agency concludes the proposed action will not result in significant impacts, it may issue a FONSI "accompanied by a convincing statement of reasons to explain why a project's impacts are insignificant." *Sierra Club*, 510 F.3d at 1018 (citation omitted). This explanation must demonstrate that the agency undertook the requisite "hard look" at the potential effects of a project. *Blue Mtn. Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).

In assessing potential effects of an action, agencies and courts should evaluate their context and intensity. 40 C.F.R. § 1508.27. In particular, courts and agencies consider up to ten intensity

---

[6]The EA must "include brief discussions of the need for the proposal, of alternatives [to the proposed action], of the environmental impacts of the proposed action and alternatives, and a listing of the agencies and persons consulted." 40 C.F.R. § 1508.9(b).

17 – OPINION AND ORDER

factors. *Id.* § 1508.27(b)[7]; *EPIC*, 451 F.3d at 1009. Here, plaintiffs generally rely on the intensity factors of controversial and uncertain effects and the effects on a threatened species. 40 C.F.R. § 1508.27(b)(4),(5),(9).

### a.  Increased Sediment Yields

Plaintiffs contend that watersheds in and around the Project area "exist in a degraded state." Pls.' Mem. in Supp. at 3; *see* NMFS 758. In particular, plaintiffs emphasize that key habitat elements of Still Creek - critical habitat for LCR steelhead - are "not properly functioning" or are "functioning at risk," and that sediment levels in Project area watersheds are elevated and "among the highest observed" in the Zigzag Ranger District. AR 27667, 27670. Plaintiffs argue that the Forest Service

---

[7]The intensity factors include:

(1) Impacts that may be both beneficial and adverse....

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects . . . are likely to be highly controversial.

(5) The degree to which the possible effects . . . are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts....

(8) The degree to which the action may adversely affect . . . or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its [critical] habitat[.]

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27(b)(1)-(10).

underestimates the amount of sediment caused by the Project, and that the increased sediment would further exacerbate the degradation of these baseline conditions, given the disturbance of twelve acres above headwater streams, the number of stream crossings, and expansion of the drainage network. AR. 27672, 27690, 27705, 27782. While plaintiffs acknowledge the Project's restoration components, plaintiffs contend that these restoration measures are inherently ineffective. Plaintiffs thus argue that the Forest Service's underestimation of the potential sediment increase combined with the overestimation of the restoration effectiveness renders the Project's impacts highly controversial and uncertain and requires the preparation of an EIS.

The Forest Service acknowledges that the Project's trails would cause some degree of sediment increase in watershed areas. Nonetheless, the Forest Service argues that the Project's design elements and incorporation of mitigation criteria "minimize sediment delivery to streams from the proposed bike trails." AR 27805, 28087. Further, the Forest Service emphasizes that restoration components of the Project will substantially improve existing sediment conditions. AR 27747, 27803-06. Thus, the Forest Service determined that the effects of the Project were neither highly controversial nor highly uncertain. AR 28091.

Initially, the court addresses plaintiffs' implicit assertion that the Forest Service relied solely on the anticipated success of restoration efforts to minimize sediment impacts of the Project below the significance level. The Forest Service asserts that the road restoration measures are not directed at the Project's impacts but are intended to address impacts from past development and activities. AR 27741, 27762-63. The Forest Service explains that "the design of the mountain bike trails and skills park, including the siting of the trails away from streams to the extent possible and the design of surface water control features (like grade reversals and sediment traps), would minimize sediment mobilization and delivery to streams." AR 28087; see EPIC, 451 F.3d at 1015 ("the Project incorporates mitigation measures throughout the plan of action, so that the effects are analyzed with those measures in place").

19 – OPINION AND ORDER

The record makes clear that the Project's design features and the accompanying PDC are intended to mitigate erosion and sediment yields of the Project. *See* AR 27757-58; FS 2ndSupp 4242-45. The Project implements features such as bridges, boardwalks, wall rides, ladders, wood tables, rollers and doubles to avoid sensitive areas and reduce ground disturbance. AR 27758, 28054-59. Further, the trails are designed to cross ephemeral streams, so that stream beds are likely to be dry during Project operations. AR 27829.[8] Finally, the PDC require consistent monitoring of the trails to ensure that sediment delivery and erosion are minimized. AR 27766, 27770-71, 28087. Notably, an agency may rely on an action's integrated mitigation measures "in determining that the overall effects [of an action] would not be significant." *EPIC*, 451 F.3d at 1015, n.6; *Nat'l Parks & Conserv. Ass'n v. Babbitt*, 241 F.3d 722, 733-34 (9th Cir. 2001), *abrogated on other grounds*, *Monsanto v. Geertson Seed Farms*, 130 S. Ct. 2743 (2010).

Thus, I do not find that the Forest Service relied solely on the restoration components to find the Project's effects insignificant.

I also reject plaintiffs' argument that the sediment impacts of the Project are highly controversial or highly uncertain. As recognized by the Forest Service, other ski areas have constructed lift-assisted biking projects. AR 27934, 27968, 28091. In this case, the Forest Service employed a modeling approach to assess and evaluate potential sediment delivery and stream drainage networks. AR 26076-89, 27803-07. The Forest Service determined that current conditions cause over 300 tons of sediment per year in the Still Creek watershed and over 400 tons per year in the West Fork Salmon Creek watershed, mostly from "administrative use roads." AR 27805. The Forest Service also has estimated that naturally-occurring sediment yields range between 114-526 tons per year in the two watershed areas. AR at 27807. The Forest Service projected that the Project would cause

---

[8]An ephemeral stream is "[a] stream or part of a stream that flows only in direct response to precipitation or snowmelt." http://water.usgs.gov/nawqa/glos.html.

approximately 37 tons of sediment per year during the two years following construction, and slightly more than 20 tons per year afterward. AR 27804-06 (Figs. 15, 16). The Forest Service thus assessed the Project's short-term sediment delivery to be approximately 1.5 and 0.4 percent of the total short-term projected sediment yield in each of the watershed areas. AR 27810, 27813.

The Forest Service ultimately concluded that, in the long term, implementation of the Project would result in a sediment reduction ratio of 6:1 and reduce sediment by twenty-five percent in the Project area. AR 27797, 27805-07 (Table 17), 27810, 27813, 28087 ("With the concurrent implementation of the restoration projects, there would be a net decrease in sediment delivered to streams overall."). Given the Forest Service's analysis, it did not arbitrarily and capriciously find that the Project's impacts are not highly uncertain or highly controversial.

Plaintiffs nonetheless contend that the Forest Service overestimated the success of the Project's restoration measures. Specifically, plaintiffs argue that the Forest Service made unwarranted assumptions about the efficacy of restoration in high-elevation areas, even though "such efforts have an extremely high rate of failure in areas at higher elevation with thin topsoil, short growing seasons, and low soil productivity, as is the case over much of the project area." AR 21071 (Rhodes' comments to Forest Service). Plaintiffs also assert that the Forest Service failed to account for the allegedly "significant time lags between a restoration project and accrual of any benefits." Pls.' Mem. in Supp. at 19.[9]

---

[9]Plaintiffs' arguments rest primarily on the declarations of their hydrologist, Jonathan Rhodes, who generally disputes the Forest Service's sediment impacts analyses for the Project. *See* docs. 19, 119. Defendants move to strike Rhodes' declarations as extra-record evidence, as the declarations are not included in the record. A plaintiff may rely on materials outside of the administrative record: 1) if necessary to determine whether the agency has considered all relevant factors and explained its decision; 2) when the agency has relied on documents not in the record; 3) to explain technical terms or complex subject matter; or 4) when the plaintiff makes a showing of agency bad faith. *Tri-Valley CARES v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012). Here, Rhodes submitted information that was considered by the Forest Service during the NEPA process and on appeal. AR 21071, 21069-86, 28014, 28016. I do not find Rhodes' declarations necessary to explain the technical

To the extent plaintiffs challenge the Forest Service's sediment yield modeling or methodology, it is well settled that an agency's choice of methodology is wholly within its discretion and should not be disturbed on judicial review. *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Defense Council*, 435 U.S. 519, 543-46 (1978); *The Lands Council v. McNair*, 537 F.3d 981, 992-95 (9th Cir 2008) (en banc) (the court must "defer to an agency determination in an area involving a 'high level of technical expertise'" and may not impose its "notion of which procedures are best"), *overruled on other grounds, Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009); *Or. Nat. Res. Council v. Goodman*, 505 F.3d 884, 897 (9th Cir. 2007) (the court does not "question [an agency's] methodology" but defers "to the agency's expertise in developing the model"). Here, the Forest Service also consulted with Tom Black, a research hydrologist who studies the effects of roads on stream drainage networks and sedimentation and road decommissioning. Mr. Black reviewed the Forest Service's sediment yield analysis and commented that it "sounds well reasoned and supported by data." AR 23998, 28016. Therefore, the court defers to the Forest Service's methodology.

Further, the Forest Service acknowledged revegetation problems in areas disturbed by past Timberline projects and the need for continued treatment until those areas are adequately revegetated.

---

terms or complex subject matter, and plaintiffs do not allege bad faith. Even if I considered Rhodes' declarations, he essentially disagrees with the Forest Service's methodology and analysis. However, the court cannot substitute Mr. Rhodes' opinion for that of the Forest Service. *Marsh*, 490 U.S. at 378. Accordingly, defendants' motion to strike (doc. 132) is granted. Likewise, defendants' motion to strike the declarations of Wise and Wisseman is granted, as their declarations have little relevance to the merits of plaintiffs' claims. Plaintiffs' motion to strike defendants' rebuttal declarations (doc. 155), offered in the event the court considers Rhodes' declarations, is denied as moot.

Plaintiffs also move to strike two additions to the administrative record lodged by the Forest Service in its reply memorandum (doc. 166-1) and shortly before oral argument (doc. 178). The documents pertain to previous road decommissioning efforts by the Forest Service, including a previous project in the Forest. Plaintiffs correctly note that these documents were not included or referenced in the administrative record initially filed by the Forest Service. I do not find these documents necessary to the court's analysis, or that they fit within an exception to allow review of extra-record evidence. Accordingly, these motions (docs. 170, 179) are granted.

AR 28040. Consequently, the EA incorporated restoration measures that "have been used in numerous locations across the Mt. Hood Meadows (MHM) ski area with success" and did not rely on the Timberline ski run restoration results. AR 27783-84. I do not find that the Project's sediment effects to be highly controversial or uncertain simply because the Forest Service cannot guarantee the immediate success of associated mitigation and restoration measures. *See Native Ecosys. v. U.S. Forest Serv.*, 428 F.3d at 1240 (information in the record favorable to the plaintiffs' position does not render a project's effects highly controversial or highly uncertain).

Regardless, contrary to plaintiffs' contention, the EA recognizes potential delay in restoration efficacy, as sediment yield is projected to be approximately thirty-seven tons per year for two years following construction, reducing to twenty tons per year afterward. AR 27806. Moreover, the Project includes monitoring requirements to ensure that the anticipated restoration benefits are achieved. AR 27766 (Table 3, Mon-1); *see also* AR 28087 ("In order to make sure that the mountain bike park and restoration projects are implemented and maintained properly, and are consistent with the analysis in the EA, I am requiring monitoring be conducted collaboratively between RLK and the Forest Service, that it [] be done on a regular basis, and that an annual monitoring report be prepared in order to ensure that the [PDC] are implemented properly.").

Ultimately, plaintiffs' assertion of speculative and ineffective restoration measures is based on their disagreement with the analyses of Forest Service experts. *See* Pl.'s Mem. in Supp. at 18-19; Rhodes Decl.; Rhodes Second Decl. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378. In other words, this court is not empowered to replace the opinion of Forest Service's experts with that of plaintiffs' expert. *Id.*; *The Lands Council*, 537 F.3d at 993. Accordingly, I find that the Forest Service reasonably concluded that the proposed restoration measures will achieve the anticipated results, and its

determination is entitled to deference.[10]

Plaintiffs next argue that, regardless of restoration measures, the Forest Service underestimated the Project's sediment impacts by relying on the unsupportable conclusion that the Project would operate only in "dry" conditions.

The record reflects that the Project would increase sediment delivery substantially if it operates in wet conditions. *See* AR 27672 ("If bike park operations are allowed outside of dry conditions sediment yield would increase by a factor of 7.5 times."). However, the Forest Service incorporated relevant PDC "ensure that the Bike Park operate[s] only under 'dry' conditions." AR 27705. As noted above, stream crossings would occur over ephemeral streams that are likely to be dry during Project operations. AR 27829. The applicable PDC provide that Project construction and operation are to be suspended if more than one inch of rainfall occurs in a 24-hour period, and/or the Bull Run River flow above the reservoirs exceeds 200 cubic feet per second (cfs). AR 27771. Project operations would remain suspended until less than one-inch of rain falls in a 24-hour period, the Bull Run River flow drops below 200 cfs, or onsite conditions become "dry enough" to allow operation. *Id.* RLK and the Forest Service would monitor the amount of rainfall through the Northwest Avalanche Center rain gauge at Timberline. *Id.* Further, PDC Soil-5 requires RLK park staff to "monitor trail conditions throughout the hours of operation on a daily basis to ensure that erosion or sediment mobilization away from the trail corridor is not occurring and/or to implement corrective action in accordance" with the PDC. AR 27770.

Plaintiffs nonetheless maintain that the Forest Service failed to explain how off-site rainfall and stream flow gauges can accurately predict on-site soil conditions and failed to provide meaningful criteria to assess when conditions are "dry enough" to permit or resume operations. *See* AR 21077

---

[10]RLK and the Forest Service emphasize that most of the restoration activities have been completed successfully, as reflected by the Forest Service's review of restoration activity. FS 2ndSupp 4242-53, 4462-64.

(Rhodes' comment stating that "summer rainfall can be highly localized, resulting in wet trails within the project area without significantly increasing streamflows in relatively remote streams"). Plaintiffs emphasize that an agency specialist raised similar concerns about the use of rainfall and stream flow gauges to assess soil conditions; AR 17620 ("I though[t] we were going to add that soil moisture was going to be monitored and if appropriate standards may be developed for suspending operations based on soil moisture that would replace the precipitation and streamflow standards").

Plaintiffs fail to recognize the onsite monitoring requirement of PDC Soil-5 and the Forest Service's position that "RLK's interest would be in protecting the trails by not allowing bikes to operate under wet conditions." AR 27770, 28016; *see also* AR 17619. Moreover, the Forest Service hydrologist examined the relevant PDC and found the agency's approach "adequate to prevent operations on overly wet trails." AR 28016 "The court defers to agency expertise on questions of methodology unless the agency has completely failed to address some factor, consideration of which was essential to a truly informed decision whether or not to prepare an environmental impact statement." *N. Cascades Conserv. Council v. U.S. Forest Serv.*, 98 F. Supp. 2d 1193 1202 (W.D. Wash. 1999) (citing *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993)). Thus, I defer to the Forest Service's determinations where, as here, those conclusions are supported by methodology that the agency deems reliable. *Native Ecosys. Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012) ("We thus defer to agency decisions so long as those conclusions are supported by studies '*that the agency deems reliable.*'").

In sum, plaintiffs' mere disagreement with the Forest Service's analysis does not render the Project's sediment effects highly controversial or highly uncertain, Accordingly, the Forest Service's decision to forgo an EIS was not arbitrary and capricious and is entitled to deference.

### b. Impacts to LCR Steelhead

Plaintiffs also argue that the Project's effects on the LCR steelhead, a threatened species, mandate the preparation of an EIS. 40 C.F.R. § 1508.27(b)(9) (agencies must consider the degree to

25 – OPINION AND ORDER

which an action may adversely affect a threatened species or its habitat). Plaintiffs emphasize that Still

Creek, within the Sandy River Basin, is considered primary habitat for winter LCR steelhead, and that

the Sandy River population of LCR steelhead is classified as a "high risk of extinction." NMFS 760,

771. Plaintiffs maintain that increased sediment in the Still Creek watershed resulting from the Project

will impact LCR steelhead, and the uncertainty about mitigation and restoration efforts require the

preparation of an EIS. This claim is based on the information known to the Forest Service at the time it

finalized the EA and issued the DN, and it does not implicate NFMS' BiOp or any supplemental BiOp

NFMS may issue.

      The Forest Service does not dispute that LCR steelhead critical habitat is present in the Project

area or that increased sediment levels may affect individual steelhead. AR 27649-50, 27667, 27670,

27675, 27803, 27834-36, 27849. Indeed, the Forest Service disclosed potential impacts to the LCR

steelhead in the BA, BE and EA. *E.g.,* AR 24206, 27696, 27849. For example, the BA and BE

disclosed that the Project would "increase sediment, turbidity and embeddedness, and road (trail)

density within critical habitat for LCR winter steelhead" and "would increase the stream drainage

network." AR 24058, 27705. The BA and BE also explained that the "magnitude and duration" of

sediment impacts was largely dependent on the "soil moisture conditions," and that the Project's

sediment impacts would be "easily offset" by restoration measures when operated in dry conditions.

*Id.* The Forest Service acknowledged that "minor negative effects" from sediment would likely occur

at the "site scale," while it noted that the Project's "design elements and PDCs minimize any negative

effects." AR. 27699. The Forest Service also determined that Project's effects would be "insignificant

at the watershed scale" due to restoration activities. *Id.*

      Accordingly, the Forest Service concluded that the Project would not significantly affect LCR

steelhead as a whole or its critical habitat, and that the Project's PDC and restoration measures would

mitigate, and in fact reduce, sediment yields. AR 24058-59, 27699, 27705-06, 27802-07, 27849,

28092. At the time, NMFS concurred with the Forest Service's assessment that the Project was not

likely to adversely affect LCR steelhead. AR 23473-74; NMFS 25-46.[11]

The mere fact that the Forest Service acknowledges potential impacts to LCR steelhead and habitat – standing alone – does not trigger the need for an EIS. As explained by the Ninth Circuit:

> Not only would such a standard deter candid disclosure of negative information, it does not follow that the presence of some negative effects necessarily rises to the level of demonstrating a significant effect on the environment. We decline to interpret NEPA as requiring the preparation of an EIS any time that a federal agency discloses adverse impacts on wildlife species or their habitat or acknowledges information favorable to a party that would prefer a different outcome. NEPA permits a federal agency to disclose such impacts without automatically triggering the "substantial questions" threshold.

*Native Ecosys. Council v. U.S Forest Serv.*, 428 F.3d at 1240. Moreover, "NEPA regulations direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species." *EPIC*, 451 F.3d at 1010; *see also Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1276 (10th Cir. 2004) ("issuance of an incidental take statement 'anticipating' the loss of some members of a threatened species does not automatically lead to the requirement to prepare a full EIS").

Based on the evidence of record, the Forest Service reasonably concluded that, although the Project may have some impact on individual steelhead and a small amount of habitat, the Project would not result in significant impacts to the LCR steelhead. The Project's action area includes a very small percentage of LCR steelhead critical habitat, with no distribution of fish within 1.2 miles of the Project area. AR 27649. The EA and BA disclose potential impacts to individual LCR steelhead at the site scale and explain that those impacts will be minimized through mitigation and restoration measures designed to reduce sediment yield. *See Nat'l Parks*, 241 F.3d 734 (the adoption of mitigation measures can justify an agency's decision not to prepare an EIS where the measures "constitute an adequate buffer against the negative impacts that may result" from the action). Finally, at the time the

---

[11] After the initiation of formal consultation, NMFS issued a BiOp and determined that the Project's sediment impacts would likely adversely affect LCR steelhead, though it found that those impact would affect a "very small number" of individuals and a "very small portion (less than 2%)" of occupied habitat. NMFS 769-70; FS 2ndSupp 4116-17.

27 – OPINION AND ORDER

Forest Service issued the EA, NMFS agreed that the Project was not likely to adversely affect the LCR steelhead.

Given this record, I cannot find that the Forest Service's determination of non-significance runs "counter to the evidence before the agency" or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43. This conclusion is based solely on evidence possessed by the Forest Service when the DN was issued and does not address whether further NEPA analysis is required as a result of NFMS' BiOp.

B.  NFMA Claims

Plaintiffs next move for summary judgment on their claims that defendants violated NFMA by failing to ensure the Project's consistency with the Mt. Hood LRMP sediment standards and with the NFP's prohibition against substituting mitigation efforts for the prevention of habitat degradation.

1.  Mt. Hood LMRP Standards

NFMA establishes both procedural and substantive requirements for the management of National Forest lands. 16 U.S.C. §§ 1600 et seq. Under NFMA, the Forest Service must develop a LRMP consisting of broad, long-term objectives for the management of the Forest. *Native Ecosys. Council v. Weldon,* 697 F.3d at 1056. NFMA requires that site-specific plans, permits, and projects be consistent with the governing forest plan. *Id.*; 16 U.S.C. § 1604(i).

In this case, the Mt. Hood LRMP includes standards and guidelines to protect aquatic ecosystems, riparian resources, and water quality. Specifically, FW 084 provides that "[a]ctivities within and adjacent to riparian areas should not accelerate sediment delivery to streams, lakes, wetlands, seeps, and springs." AR 353. Further, FW 097 and 098 require that spawning habitat maintain less than 20% fine sediments. AR 354. Plaintiffs argue that the agency failed to explain how the sediment-related impacts of the Project are consistent with these directives.

The record reflects that the Project would increase sediment yields in the short term, and the Forest Service acknowledges that Still Creek and the West Fork Salmon River watersheds currently do

28 – OPINION AND ORDER

not meet the LRMP requirement of less than 20% fine sediment. AR 27670, 27793-94. However, the Forest Service disputes plaintiffs' contention that the Project violates the LRMP.

The Forest Service emphasizes that its modeling results indicate that the Project ultimately will reduce sediment in the Still Creek and West Fork Salmon River areas by approximately fifty percent and seven percent, respectively, and "should reduce levels of in-channel fine sediment in both Still Creek and West Fork Salmon River in the vicinity of the project." AR 27806. The Forest Service thus argues that the Project will not violate FW 097 or 098, because the Project will not "accelerate" and is expected to reduce sediment delivery in watershed areas. *See, e.g., League of Wilderness Defenders/Blue Mtn. Biodiversity Proj. v. Forest Serv.*, 549 F.3d 1211, 1223 (9th Cir. 2008).

Where a forest plan directive is susceptible to more than one meaning, the Forest Service's interpretation and implementation of its own plan is afforded substantial deference unless plainly erroneous. *Native Ecosys. Council v. Weldon*, 697 F.3d at 1056; *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 554-55 (9th Cir. 2009); *Native Ecosys. Council v. U.S. Forest Serv.*, 418 F.3d at 960 ("Agencies are entitled deference to their interpretation of their own regulations, including Forest Plans."); *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097–99 (9th Cir. 2003).

Given the results of the Forest Service's analysis, it did not act arbitrarily in finding that that the Project will not accelerate sediment delivery to streams. Though plaintiffs and their expert dispute the Forest Service's methodology and conclusions, the agency's expertise is entitled to deference, particularly when interpreting its own forest plan.

    2.  <u>National Forest Plan Standards and Guidelines</u>

Plaintiffs next assert that the Forest Service violated the NFP Aquatic Conservation Strategy (ACS) Riparian Reserve Standards and Guidelines (S&G). The ACS S&G serve to maintain and restore the health of watersheds and aquatic ecosystems and applies to Riparian Reserves and key watersheds, both of which are present in the Project area. FS Supp 1311-13. Specifically, Watershed and Habitat Restoration Guideline 3 (WR-3) provides: "Do not use mitigation or planned restoration

29 – OPINION AND ORDER

as a substitute for preventing habitat degradation." FS Supp 1373. Plaintiffs argue that the Forest Service relied entirely on restoration projects to "offset" the impacts of sedimentation caused by the Project, an approach inconsistent with WR-3's prohibition against using restoration "as a substitute for preventing habitat degradation." *See* AR 27829 (discussing reduction of sediment yields through restoration measures); FS Supp 1373.

As an initial matter, plaintiffs appear to argue that any sediment impacts of the Project will cause "degradation" in violation of the guidelines. However, the fact that the Project may cause short-term sediment impacts does not mean that the Project will cause "degradation." *See Bark v. U.S. Bureau of Land Mgmt.*, 643 F. Supp. 2d 1214, 1234-35 (D. Or. 2009) (increased short term impacts or evidence of some degradation does not "standing alone, constitute ACS noncompliance"). If that was the case, no agency action near Riparian Reserves would ever be allowed.

Here, the record reflects that the Forest Service evaluated the Project's effects in light of ACS objectives for both short-term and long-term impacts. AR 27827-31. More importantly, the record supports the Forest Service's assertion that it did not substitute restoration for the prevention of degradation. The Forest Service modified the Project design and incorporated PDC to avoid and minimize adverse effects to streams and watershed areas. AR 27757-58, 28095-28108. Specifically, the Forest Service rerouted trails, reduced the number of trails and acres of ground disturbance, and implemented design and monitoring measures in an effort to reduce sediment impacts. *See* AR 27747, 27750-58, 27766-78.

Further, the Project's restoration measures generally address past activities that impact current sediment levels in both Still Creek and West Fork Salmon Creek. AR 27823 ("The proposed watershed restoration projects address existing developments that are currently depositing sediment in both the Still Creek and West Fork Salmon River systems."). Thus, the record supports the Forest Service's position that the Project's restoration activities are intended to restore existing degraded areas and to improve existing conditions rather than to serve as substitutes for the prevention of

30 – OPINION AND ORDER

degradation. *See* AR 27823-24, 28087, 29257. In sum, the Forest Service reasonably concluded that the Project does not violate WR-3 and is consistent with the ACS. *Bark*, 643 F. Supp. 2d at 1234-35.

## CONCLUSION

Plaintiffs' Motion for Summary Judgment (doc. 118) is DENIED and defendants' and RLK's Cross-Motions for Summary Judgment (docs. 128, 139) are GRANTED on plaintiffs' NEPA claims that the Forest Service failed to prepare an EIS for the Project and failed to conduct NEPA analysis for the MDP, and on plaintiffs' NFMA claims that the Forest Service failed to ensure the Project's consistency with Mt. Hood LRMP sediment standards and violated the NFP's prohibition against substituting mitigation efforts for the prevention of habitat degradation. The parties' motions are STAYED with respect to plaintiffs' NEPA claim regarding supplemental analysis and their ESA claims.

Defendants' Motion to Strike (doc. 132) is GRANTED, plaintiffs' First Motion to Strike (doc. 155) is DENIED as moot, and plaintiffs' Second and Third Motions to Strike (docs. 170, 179) are GRANTED. Finally, RLK's motion to correct transcript (doc. 186) is GRANTED, in part. The transcript shall be corrected as follows: the word "areas" shall be changed to "years" on page 85, line 4, and the word "knows" shall be changed to "acknowledged" on page 88, line 23. The motion is denied in all other respects.

Within 30 days for from the date of this Opinion and Order, the Forest Service shall provide a status report on the renewed consultation. The parties shall also confer and inform the court whether they are amenable to judicial settlement efforts.

IT IS SO ORDERED.

Dated this _25th_ day of March, 2016.

_____
Ann Aiken
United States District Judge

31 – OPINION AND ORDER