IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

BARK, an Oregon non-profit corporation,
FRIENDS OF MOUNT HOOD, an Oregon
non-profit corporation, NORTHWEST
ENVIRONMENTAL DEFENSE CENTER,
an Oregon non-profit corporation, and
SIERRA CLUB, a California non-profit
corporation,

        Plaintiffs,

    v.

LISA NORTHROP, Acting Forest Supervisor
of the Mt. Hood National Forest, BILL
WESTBROOK, Zigzag District Ranger,
KENT CONNAUGHTON, Regional Forester
for Region 6, and the UNITED STA TES
FOREST SERVICE, a federal Agency;
WILLIAM STELLE, Regional Director of the
West Coast Region, and the NATIONAL
MARINE FISHERIES SERVICE,

Defendants,

 RLK AND COMPANY, an Oregon
corporation,

Defendant-Intervenor.

Case No. 3:13-cv-00828-AA
**OPINION AND ORDER**

AIKEN, District Judge:

Plaintiffs filed suit under the Administrative Procedures Act ("APA"), alleging violations of the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), and the Endangered Species Act ("ESA") by defendants United States Forest Service ("the Forest Service") and National Marine Fisheries Service ("NMFS"). Plaintiffs' claims arise from the Forest Service's approval of the Timberline Ski Area Mountain Bike Trails and Skills Park ("the Project") and NMFS' issuance of a Biological Opinion ("BiOp") and Incidental Take Statement ("ITS") regarding the Project's effects on Lower Columbia River ("LCR") Steelhead. Plaintiffs ask that the court set aside the federal agencies' decisions and enjoin the Forest Service from implementing the Project until the agencies comply with NEPA, NFMA, and the ESA. The Forest Service and NFMS deny plaintiffs' claims and maintain that their decisions are supported by the record and entitled to deference.

Previously, I denied plaintiffs' Motion for Summary Judgment and granted defendant and defendant-intervenor, RLK's, Cross Motions for Summary Judgment. (doc. 192) However, I stayed consideration of the parties' motions with respect to plaintiffs' NEPA claim regarding supplemental analysis as well as their ESA claims.

Plaintiffs now move for Summary Judgment on these remaining claims (doc. 215) and Partial Reconsideration of my previous order regarding their NFMA claim. (doc. 216.) Defendants and RLK have also filed Cross Motions for Summary Judgment on these claims remaining claims. (docs. 218 and 219). For the reasons set forth herein, Plaintiff Motion for Summary Judgment and Motion for Partial Reconsideration are DENIED, and defendants and RLK's Cross Motions for Summary Judgment are GRANTED.

/ / /

**BACKGROUND**

This case arises out of RLK's desire to offer lift-accessed, downhill mountain biking on bike trails served by the Jeff Flood chairlift at the Timberline Lodge And Ski Area ("Timberline") during summer months. AR 11215. After RLK submitted initial plans for the Project, the Forest Service undertook varied activities to study and modify the Project that are set out in greater detail in my previous Order and Opinion. (doc 192)

Relevant to the present motions is that on November 19, 2012, the Forest Service released its final Environmental Assessment ("EA") and issued a Finding of No Significant Impact ("FONSI") and a Decision Notice ("DN") approving the Project. AR 27732-28084, 28085-108. Plaintiffs appealed the DN. AR 28153-74. The Appeal Reviewing Officer recommended that the appeal be denied, and the Regional Forester denied the appeal. AR 29284-89, 29290-29322.

As approved, the Project is a chairlift-assisted mountain biking development with seventeen miles of bike trails and a small skills park within an area designated for managed recreation. *See* AR 27736-27739, 27946, 28084. The Project also includes 2.1 miles of restoration projects. AR 27754, 27762-63. Yearly operations for the bike trail and skills park would begin when snowmelt allows for trail maintenance, generally mid-to-late July, and would cease in the fall or when "soil moisture and the resulting impacts to trail conditions are determined to be sufficient" to dictate cessation of operations. AR 27765. Similarly, construction and/or operation of the Project would cease if more than one-inch of rain falls within a 24-hour time period, or the flow of the nearby Bull Run River exceeds 200 cubic feet per second. AR 27771.

On May 16, 2013, plaintiffs filed their first complaint seeking judicial review of the

Forest Service's decision to approve the Project. Subsequently, the parties agreed that the Forest Service would not proceed with construction of the bike trails and the skills park until the court resolved plaintiffs' claims through cross-motions for summary judgment. The parties also agreed that certain restoration activities of the Project could proceed.

In July and August 2013, the Xerces Society for Invertebrate Conservation ("Xerces") surveyed meadows on Mt. Hood and located the Western bumblebee, a sensitive species, in the Project area. FS 2ndSupp 272, 282, 887.[1] The Forest Service's wildlife biologist "review[ed] the found locations and consider[ed] this information in regards to the analysis" of the Project. FS 2ndSupp 887. In December 2013, the Forest Service prepared a New Information Review ("NIR") regarding the bumblebee. FS 2ndSupp 886-922. The Forest Service determined that the Project "may impact individual[] [bees] or habitat, but will not likely contribute to a trend towards Federal listing or loss of viability of the population or species." FS 2ndSupp 887. The Forest Service nonetheless adopted additional project design criteria "PDC" proposed by the wildlife biologist to alleviate several concerns raised by Xerces. *See* FS 2ndSupp 887-88, 894-96.

On December 23, 2013, plaintiffs provided notice of their intent to sue NFMS for ESA violations involving the LCR Steelhead. FS 2ndSupp 317-27; NMFS 133-43. On March 14, 2014, plaintiffs filed a First Amended Complaint ("FAC") and added claims alleging that defendants failed to perform supplemental NEPA analysis for the Western bumblebee and failed to engage in formal consultation with NMFS with respect to the LCR steelhead.

On March 27, 2014, the Forest Service and NMFS initiated formal consultation on the

---

[1]"'Sensitive species' are those species that are not endangered, but for which there is concern about the viability of their populations." *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 n.1 (9th Cir. 1996).

LCR steelhead. FS 2ndSupp 3861-63. On August 5, 2014, NMFS issued a BiOp concluding that the Project was not likely to jeopardize the continued existence of the LCR steelhead or adversely modify its critical habitat. NMFS 727, 773. However, NMFS found that the Project was likely to adversely affect individual LCR steelhead. NMFS 769-70. NMFS thus mandated terms and conditions for the Project, including sediment control measures, design features to minimize sediment delivery during operations, and pollution and erosion control measures. NMFS 776-80. These terms and conditions largely mirror the Project's PDC included in the EA. Due to the adverse impacts to individual steelhead and specific habitat, NMFS issued an ITS authorizing the "take" of steelhead incidental to the Project. NMFS 773.

On September 18, 2014, the Forest Service issued a New Information Report ("NIR") and concluded that NMFS's discussion of the Project's effects on LCR steelhead was consistent with the effects considered and disclosed in the EA. Thus, the Forest Service found that supplemental NEPA analysis was not required. FS 2ndSupp 4243-44, 4248-53.

In late 2014, RLK submitted its 2014 Timberline Lodge Bike Park Project Annual Monitoring Report to the Forest Service. FS 2ndSupp 4368-461. According to the report, the majority of the restoration work associated with the Project and included in the DN/FONSI was completed successfully during 2013 and 2014. The Forest Service then issued the "Phase 2 of the Restoration Activities associated with Timberline Ski Area Mountain Bike Trails and Skills Park Progress Report" prepared by a Forest Service fisheries biologist. FS 2ndSupp 4462-64.

On November 20, 2014, plaintiffs filed a Second Amended Complaint alleging that the Forest Service must conduct supplemental NEPA analysis regarding the Project's effects on the LCR steelhead (as well as the Western bumblebee), and that the BiOp and ITS are arbitrary and capricious in violation of the ESA. The parties then proceeded with motions for summary

judgment pursuant to a stipulated briefing schedule.

After hearing oral argument on the motions, defendants informed me that the Forest Service and NMFS reinitiated consultation after discovering that the riparian disturbance take surrogate identified in the BiOp had been exceeded. Specifically, ground-disturbing activities related to the Project's restoration measures apparently caused ground disturbance of 1.58 acres, which is .04 acres greater than the disturbance area surrogate specified in the BiOp. I held that the renewed consultation raised the specter that NMFS would issue a new or revised BiOp, thus rendering moot plaintiffs' ESA claims and providing additional information to consider in the context of plaintiffs' NEPA supplementation claims. Therefore, I stayed consideration of plaintiffs' supplemental NEPA and ESA claims. On March 25, 2016, I entered an Opinion and Order granting Summary Judgment in favor of defendant regarding plaintiffs NEPA and NFMA claims. (doc. 192)

On August 4, 2016, NMFS issued a new BiOp analyzing the effects of the Project on LCR steelhead and its critical habitat. NMFS 2AR 1634-708. NMFS again concluded that the Project was not likely to jeopardize the continued existence of the LCR steelhead or result in the destruction or adverse modification of its critical habitat. NMFS 2AR 1634. In December 2016, after inviting public comments on the analysis and its tentative findings, the Forest service determined that the 2016 BiOp did not constitute significant new information requiring supplemental NEPA of the 2012 EA. 4th SUPP AR 6058-63. Regarding the Western bumblebee, new surveys of bee locations were taken in 2015 and 2016. 4th Supp AR 2738; 5017-20, 5021-22. On October 13, 2016, the Forest Service provided the survey data to the public and invited comment on its tentative findings. 4th SUPP AR 5023-5029. On December 14, 2016, the Forest Service determined that NEPA supplementation was not required regarding the Western bumblebee.

On January 26, 2017, plaintiffs filed their Third Amended Complaint ("TAC"). The

parties then entered a joint briefing schedule for the present motions. The Court heard oral argument on October 16, 2017. Thus, I now turn to the remaining claims in the TAC.

## STANDARD OF REVIEW

A federal agency's compliance with NEPA is reviewed under the APA. 5 U.S.C. § 706. Plaintiffs also seek review of their ESA claim under the APA. The APA allows a final agency action to be set aside if, after reviewing the administrative record, the court determines that the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Natural Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 877 (9th Cir. 2005) (quoting 5 U.S.C. § 706(2)(A)). Review under this standard is narrow, and the court may not substitute its judgment for that of the agency. *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 573 (9th Cir. 1988). Nevertheless, while this standard is deferential, the court must "engage in a substantial inquiry . . . a thorough, probing, in-depth review." *Native Ecosys. Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (citation and internal quotations omitted).

> Generally, the court will reverse an agency's decision as arbitrary or capricious
>
> if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (quoting *W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 900 (9th Cir. 1996)). Thus, in order to withstand summary judgment, the "agency must articulate a rational connection between the facts found and the conclusions reached." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1023 (9th Cir. 2007); *see also Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (courts examine "whether the decision was based on a consideration of the relevant factors and whether

there has been a clear error of judgment").

**DISCUSSION**

I.    *Plaintiffs' Supplemental NEPA Claims*

Plaintiffs argue that the Forest Service violated NEPA by failing to conduct supplemental

NEPA analysis after NFMS concluded that the Project is likely to adversely affect and "take"

LCR steelhead. They further aver that supplemental NEPA was required by the discovery of the

Western bumblebee in the Project area.

NEPA imposes a continuing duty on federal agencies to supplement their environmental

analyses when presented with new information. 40 C.F.R. § 1509(c)(1)(ii); *Price Rd.*

*Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1508-09 (9th Cir. 1997)

(supplemental EA is required if the environmental impacts of changed circumstances "are

significant or uncertain"). However, supplementation is not required "every time new

information comes to light . . . . To require otherwise would render agency decision making

intractable, always awaiting updated information." *Marsh*, 490 U.S. at 373. Rather,

supplemental NEPA analysis is required if new information or circumstances could result in

significant impacts that were not previously evaluated and considered, or where new information

presents "a seriously different picture of the likely environmental harms stemming from the

proposed action." *Airport Cmty. Coal v. Graves*, 280 F. Supp. 2d 1207, 1219 (W.D. Wash.

2003); *see also Marsh*, 490 U.S. at 373-74 (supplemental NEPA analysis required "if the new

information is sufficient to show that the remaining action will 'affec[t] the quality of the human

environment' in a significant manner or to a significant extent not already considered"); *N. Idaho*

*Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1157 (9th Cir. 2008); *Sierra Club*

*v. Bosworth*, 2005 WL 3096149, at 8 (N.D. Cal. Nov. 14, 2005).

The Forest Service may assess the significance of new information in a supplemental information report ("SIR") to determine whether such information requires supplemental NEPA analysis. *See Friends of the Clearwater,* 222 F.3d at 555, 566 n.3 (noting that a SIR "is the appropriate means by which to make an initial evaluation of the significance" of new information). However, a SIR cannot supplant necessary NEPA analysis once an initial significance determination is made. *Idaho Sporting Congress v. Alexander,* 222 F.3d 562, 565, 566 (9th Cir. 2000) (reevaluation documents are used to assess the initial significance determination and cannot supplant required NEPA analysis).

A.    *LCR Steelhead*

Plaintiffs argue that the Forest Service's 2012 EA/DN/FONSI do not accurately describe the degree of the projects impacts on the LCR Steelhead. Specifically, they contend that understanding of the Project's impacts is materially different now than when the Forest Service published its EA/DN/FONSI in 2012. Defendants aver that the Forest Service made rational decisions in finding that the 2014 and 2016 BiOps did not give rise to a significantly new understanding of the Project and its environmental effects compared with those found in the 2012 EA. They declare those reports reflect that the effects of the Project on the LCR steelhead remain non-significant within the meaning of NEPA. FS 2ndSupp 4244, 4th SUPP AR 6041.

As noted above, in 2014, the Forest Service and NMFS reinitiated ESA consultation regarding the Project's effects on the LCR steelhead, and NMFS subsequently issued a BiOp. NMFS found that the sediment generated by the Project was likely to adversely affect individual steelhead and a small area of habitat. Nonetheless, NMFS determined that the PDC and other design and mitigation measures would minimize sediment delivery and other effects; thus, it concluded that the Project "is not likely to jeopardize the continued existence of LCR steelhead

or to destroy or adversely modify its designated critical habitat." NMFS AR 773; FS 2ndSupp 3862, 4074, 4108-20. Given its finding that the Project would likely adversely affect and "take" a small number of individual LCR steelhead, NMFS issued an Incidental Take Statement ("ITS"). NMFS 774–76.[2]

After reviewing this BiOp, the Forest Service issued a NIR and concluded that the information and findings therein were "within the scope and range of effects considered" in the EA, and that supplemental NEPA analysis was not needed. FS 2ndSupp 4244. The NIR also noted that the effects of ongoing restoration activities remained consistent with the findings in the 2012 EA. FS 2ndSupp 4246. The Forest Service incorporated the mitigation measures required by the BiOp, many of which mirrored the Project's PDC. FS 2ndSupp 4242-53.

The Forest Service reinitiated ESA consultation with NMFS again, after determining that ground work to implement a Project restoration measure had disturbed 0.04 riparian acres greater than was specified under the 2014 BiOp. There was no functional change in habitat processes for LCR steelhead from the exceedance, nor did the exceedance result in any tree removal or overhanging vegetation disturbance. 4th SUPP AR 4398. On August 4, 201, NMFS issued new

---

[2] Under the ESA, federal agencies must ensure that any agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2). To comply with the ESA, an agency must make a preliminary determination of a proposed action's effects on listed species and critical habitat. 50 C.F.R. § 402.14(a)–(b). If the agency decides that the proposed action may affect but is not likely to adversely affect (NLAA) a listed species, it may engage in informal consultation with the appropriate expert agency, such as NMFS. *Id.* §§ 402.13; 402.14(b); 16 U.S.C. § 1536(a)(2). If the consulting agency concurs with the preliminary NLAA determination, no further consultation is necessary. 50 C.F.R. §§ 402.13, 402.14(b)(1). However, if an action agency determines that the proposed action is likely to adversely affect (LAA) a listed species, or if the consulting agency does not concur in the NLAA determination, formal consultation is required. *Id.* § 402.14. In those cases, the consulting agency must prepare a biological opinion assessing whether the proposed action is likely to jeopardize the continued existence of a listed species or adversely modify its critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g).

BiOp that analyzed the effects of the Project on the LCR steelhead and its designated critical habitat. This 2016 BiOp also concluded that "the proposed action is not likely to jeopardize the continued existence of the LCR steelhead or to destroy or adversely modify its designated critical habitat." NMFS 2AR 1682-83. After inviting public comment on this analysis and its tentative findings, the Forest service issued a NIR finding the that 2016 BiOp did not constitute significant new information requiring NEPA supplementation. The Forest Service found that "almost all of the terms and conditions are the same as or actually more protective than those contained in the 2014 biological opinion. 4th Supp. AR 6060-61.

Plaintiffs argue that the "discrepancy" between the Forest Service's "not significant" finding and NFMS's later "likely to adversely affect" assessment triggered the need for supplemental NEPA analysis to reanalyze the Project's effects on LCR steelhead; particularly when the Forest Service's finding of "not significant" was premised on its conclusion that the Project would not likely adversely affect LCR steelhead. *See Wildlands v. U.S. Forest Serv.*, 791 F. Supp. 2d 979 (D. Or. 2011) (discovery that consulting agency's "likely to adversely affect" finding was misrepresented in the the EA triggered supplemental NEPA analysis). Plaintiffs further contend that NMFS's 2014 and 2016 BiOps and issuance of an ITS constitute a significant change in circumstance that requires further analysis.

At first glance, plaintiffs present a persuasive argument. Most often, new information about adverse effects to a listed species would be "significant." However, supplemental NEPA analysis is required only when new information or circumstances could result in significant impacts that were not previously evaluated or considered. *See Marsh*, 490 U.S. 360. Thus, the fact that NMFS found likely adverse effects and issued a BiOp does not necessarily render trigger a finding of "significance" or supplemental analysis under NEPA. *See E.P.I.C. v. U.S.*

*Forest Service*, 451 F.3d 1005, 1012 (9th Cir. 2006); *Alliance for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 606-07 (9th Cir. 2014) ("Reconsultation under Section 7 does not imply that 'significant new circumstances or information' have arisen which would require analysis under NEPA.") Likewise, the issuance of an ITS is not necessarily evidence of a significant impact, given NEPA's directive to "consider the degree of adverse effect on a species, not the impact on individuals of that species." *EPIC*, 451 F.3d 1010. Significantly, the impacts on LCR steelhead discussed in the BiOp are similar to those disclosed and discussed in the EA.

The 2014 BiOp discussed several potential impacts to LCR steelhead, including that sediment impacts from the Project would likely affect only a "very small number" of individual LCR steelhead, because "the population is well distributed throughout its current range in the Sandy River and the project will affect only a very small portion" of critical habitat. NMFS 770. NMFS emphasized that "there are numerous restoration actions" occurring in the Still Creek watershed downstream of the Project area, and "we expect LCR productivity to continue to increase in those areas." NMFS 772. NMFS ultimately concluded that the Project will have "no impact on population abundance and productivity" and "will not degrade the conservation value of designated critical habitat," given that the Project will largely affect "marginal" quality habitat that is "not particularly important or productive" for the species. NMFS 771-73. In fact, no LCR steelhead are located within 1.2 miles of the project. NMFS 749; AR 27836.

Likewise, the 2016 BiOp found that the majority of the LCR Steelhead habitat at issue is of marginal quality and "not particularly important to LCR steelhead." NMFS 2AR 1681. Specifically, as to the Project's effects, the 2016 BiOp found that only a "very small number of individuals will be affected since the population is well distributed throughout its current range in the Sandy River and the project will affect only a very small portion (less than 2%) of their

occupied habitat." NMFS 2AR 1679. The 2016 BiOp also considered the Project's restoration actions as part of the baseline for its analysis, since most of the work had been substantially completed. NMFS 2AR 1682-83. NMFS found that while these actions are causing short term adverse sediment impacts they will bring long term reductions in fine sediment inputs to stream systems. NMFS2 AR 1670, 1682.

In other words, the Forest Service and NMFS both concluded the sediment impacts from the Project could impact the LCR Steelhead, but that those effects would be "minor." Though NMFS found that minor, adverse effects are likely to occur to individual fish and a small percentage of critical habitat, the agency also found no significant adverse effects to the species as a whole. *See Swan View Coalition v. Weber*, 52 F. Supp. 3d 1133 (D. Mont. Sept. 25, 2014) (finding no NEPA violation where agency made LAA determination regarding a project effects but conducted no further NEPA evaluation in light of the small scale and low severity of effects to species). Further the mitigation measures imposed by NMFS – to alleviate impacts to individual fish – mirror the PDC evaluated in the EA.

Plaintiffs rely on *Wildlands, supra.* There, the Forest Service approved a timber project, and the EA stated that "[c]onsultation with the [Fish and Wildlife Service] has resulted in a 'may affect, but not likely to adversely affect' determination." *Wildlands,* 791 F. Supp. 2d at 988. However, the FWS had, in fact, found that the project was likely to adversely affect the northern spotted owl; the Forest Service subsequently conceded this finding. *Id.* at 985. In setting aside the EA, the district court found that "the public evaluation process of the proposed agency action and its impact on the environment was skewed by the inaccurate and misleading 'not likely to adversely impact' the northern spotted owl determination in the EA." *Id.* at 991. Plaintiffs here argue that the Forest Service's finding of not likely to adversely affect the LCR steelhead, when

viewed in light of the NMFS' finding of likely adverse effects, likewise "robbed the public of an accurate and complete picture of the Project's impacts." *Id.*

In the present case, the Forest Service did not provide inaccurate or misleading information in the EA, rather NMFS initially concurred with the Forest Service's "not likely to adversely affect" finding. The Forest Service disclosed all relevant information known to the agency at the time, and plaintiffs do not contend otherwise. Further, in spite the "likely to adversely affect" finding, NMFS concluded, in both the 2014 and 2016 BiOps, that the Project is not likely to jeopardize the continued existence of LCR steelhead or destroy or adversely modify its designated critical habitat. Thus, I find *Wildlands* distinguishable from this case *sub judice*, and the mere fact that NMFS found likely adverse effects does not trigger further NEPA analysis unless NMFS's finding implicates impacts that could significantly affect the environment in a manner not already considered by the Forest Service.

Accordingly, the Forest Service's decision that it need not conduct supplemental NEPA analysis for the LCR Steelhead does not rise to the level of an arbitrary and capricious agency action

B.    *Western Bumblebee*

Plaintiffs next argue that the Forest Service failed to take a "hard look" at whether the discovery of the Western bumblebee – a sensitive species - in the Project area was significant and warranted supplemental NEPA analysis. The Western bumblebee was designated as a Region 6 Sensitive Species in 2011. Further, in 2016, FWS determined that new information indicates that listing the bumblebee under the ESA may be warranted.

As it did with the LCR steelhead, the Forest Service reviewed the information about the Western bumblebee in a 2013 NIR and concluded that "the effects determination for this project

on the Western bumblebee is may impact individuals or habitat, but will not likely contribute to a trend towards Federal listing or loss of viability of the population or species." FS 2ndSupp 887.

In so concluding, the Forest Service relied on a biologist's expert report. The biologist recognized that the Project could potentially affect the bee's suitable habitat but noted that the "minor" loss of habitat was "unlikely" to affect bee populations in light of the surrounding "acreages of undisturbed natural areas." FS 2ndSupp 0894. Further, the biologist noted that the Project would not impact known bee foraging locations, and suitable foraging sites are more than 20 feet from the proposed trails. FS 2ndSupp 0894. The report also stated that the documented bee sites are adjacent to roads and near the Timberline Lodge, where there is already heavy human presence. FS 2ndSupp 0894. Finally, it pointed out that no nests had been discovered in the Project area, though the Forest Service's biologist did recommend the addition of protective PDC, such as buffers to protect potential nesting sites. FS 2ndSupp 0887. In light of these findings, the Forest Service determined that the environmental effects of the Project remained "consistent with the findings in the 2012 EA and decision," and new information about the bumblebee were "within the scope and range of the effects considered." FS 2ndSupp 0889.

Subsequent to the 2013 NIR, the Forest Service obtained funding for further surveys for the bumblebee in the Mt. Hood National Forest. The first of these surveys, performed in 2015, found bees in six new previously unreported locations. 4th Supp. AR 2738. The Forest Service noted in a report that the discovery of these sites provided further evidence that while small projects would affect individual bumblebees, they would not likely decimate the entire population. In 2016, the Forest Service obtained more funding and conducted additional surveys. The Forest Service's expert noted that there were various bee populations across the National Forest, at a broad range of elevations. More bumblebees were also discovered in areas

remote from the Timberline Permit Area. On October 13, 2016, the Forest Service provided the survey data to the public and invited public comment on its tentative finding that the information did not require supplemental NEPA. 4th Supp AR 5023-29. On December 14, 2016, the Forest Service issued an NIR determining that NEPA supplementation was not required based on this new information.

Plaintiffs' primary argument is that the Forest Service did not determine whether the discovery of the bumblebee was "significant" new information in the 2013 and 2016 NIRs and instead impermissibly evaluated the Project's potential impacts on the bumblebee, as evidenced by the incorporation of further protective PDC.[3] Essentially, plaintiffs argue that the Forest Service cannot assess whether impacts associated with new information will cause "significant effects" when determining the "significance" of the new information. This analytical restriction leads to circular results, for how can the Forest Service assess the significance of new information without considering potential impacts or effects associated with that information? Again, the applicable standard is whether "the new information is sufficient to show that the remaining actions will affect the quality of the human environment in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 373-74. (internal quotations omitted) Thus, in some cases, to determine the significance of new information, an agency must determine whether such information raises the possibility of "significant effects."

I find that the 2013 and 2016 NIRs were used appropriately to determine whether to supplement the existing 2012 EA, explaining why further NEPA supplementation was not required. I also note that courts have upheld an agency's use of a supplemental report to assess

---

[3] The PDC included measures such as limiting trail construction season to avoid harm to both spring and autumn overwintering queens, requiring pre-construction nest surveys and field examination for nests during trail constructions, and re-routing trails as required if any nests are identified near the proposed construction corridor. FS 2ndSupp 895-96, 888.

whether significant impacts or effects arise from the discovery of new information. *See, e.g., Marsh,* 490 U.S. at 383-85, (upholding Army Corps' use of SIR to analyze significance of new reports regarding a dam project); *Price Rd.,* 113 F.3d at 1510 (upholding use of "reevaluation" document to determine significance of proposed change to the design of a highway interchange); *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.,* 42 F.3d 517, 529-30 (9th Cir. 1994) (affirming use of "Memorandum of Record" to evaluate significance of wildfires in project area); *see also Friends of the Bow v. Thompson,* 124 F.3d 1210, 1218-19 (10th Cir. 1997) (upholding use of SIR to evaluate significance of new survey area of land to be logged).

Further, the cases relied upon by plaintiffs are distinguishable. For example, in *Or. Natural Desert Ass'n v. Sabo,* 854 F. Supp. 2d 889, 923-24 (D. Or. 2012), there was evidence of new sensitive species in a grazing allotment and actual damage to the species' habitat, and the agency did not dispute that supplementation was warranted. In *Cascadia Wildlands v. BLM,* 2012 WL 6738275 at 11 (D. Or. 2012), surveys subsequent to NEPA analysis suggested that a project could visit irreparable injury on the entire population of the red tree vole as the project area contained the last remaining stronghold for the species. The scope of the current Project and the bumblebee's status are clearly distinguishable. The size of The Project here is only 17 miles of mostly linear trails and a skills park. Importantly, as the Forest Service noted, while some individual bees might be affected, it seems unlikely that the Project's effects threaten the entire bumblebee population. No bumblebees have been discovered at locations where mountain bike trails will be constructed. FS 2ndSupp 887. Moreover, the survey data in this case indicates that the bumblebees are found varied locations and elevations as well as at sites remote from the Timberline area.

Plaintiffs also complain that the Project's impacts on the bumblebee were not mentioned

in the initial NEPA process. Defendants correctly note however, that once the bumblebee was added to the Sensitive Species list in 2011, the Forest Service followed guidance from the Regional Forester that all projects initiated prior to the date the listing was changed could use the species list that was in effect when the project was initiated. FS 2ndSupp 887. Moreover, once bumblebees were discovered in the Timberline area, the Forest service undertook a Biological Evaluation and further reviewed the Project's effects on the bumblebee. FS 2ndSupp 886-904. This ultimately culminated in the issuance of the 2013 and 2016 NIRs. Again supplemental NEPA is not triggered merely by new information, but only by new information that would "affect the quality of the human environment in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S at 374. (internal quotations omitted)

Finally, plaintiffs argue that the NIRs' conclusions were arbitrary and capricious because the Forest Service focused on foraging, rather than nesting, sites for the bees. Plaintiffs emphasize that the Xerces society warned that avoiding high quality nesting areas during construction and park operation was crucial to the bumblebee's survival. As noted above, no bee nests were discovered in locations where trails would eventually operate. However, the Forest Service biologist, in light of feedback offered by Xerces recommended additional PDC, which was adopted by the Forest Service, to ensure minimal impacts on the bees. The PDC adopted by the Forest Service requires pre-construction nest surveys to be conducted, and trails will be rerouted if nests are discovered near the proposed construction corridor.

For all these reasons, the Forest Service's decision that it need not conduct supplemental NEPA analysis for the Western bumblebee, though perhaps disputable, does not rise to the level of arbitrary and capricious agency action.

II.    *Remaining ESA Claim*

Finally, the parties move for summary judgment regarding plaintiffs remaining ESA claim. Specifically, plaintiffs allege that NMFS failed to take a required step in its section 7 consultation, namely ensuring project-level consistency with the Aquatic Conservation Strategy ("ACS") of the Northwest Forest Plan ("NWFP").

Plaintiffs argue that NMFS is required to independently evaluate the Project's consistency with ACS, as provided by NFMS' 1998 programmatic BiOp assessing the effects of the Mt. Hood LMRP on LCR steelhead. NMFS 8783, 8815. Plaintiffs assert that despite this requirement, the 2016 BiOp arrived at its conclusions and related findings based on an independent analysis that that does not rely on ACS consistency. NMFS2AR 1642.

Generally, it is the Forest Service's responsibility to comply with NFMA and related ASC, while NMFS's duties arise under the ESA. Likewise, the 1998 Programmatic BiOp requirement that proposed actions be consistent with the ACS generally applies to the action agency, here the Forest Service. NMFS AR 8815.

Nonetheless, plaintiffs cite *Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028 (9th Cir. 2001) in support of this argument. However, there the court made clear that if NMFS chooses to rely on ACS consistency to reach its "no jeopardy" conclusion, the agency must make an independent finding of such consistency. *Id.* at 1034-35. The court also noted that NMFS could reach a "no jeopardy" conclusion on other grounds. *Id.* ("Presumably, other methods of reaching a jeopardy determination are available to NMFS.") The court made clear that, ultimately, NMFS's "primary obligation is to determine a project's effect on listed fish species." *Id.*

Here, NMFS did not rely on ACS consistency in rendering its "no-jeopardy" finding. Rather, NMFS relied on the mitigation and reduction of sediment yield, and the small amount of

critical habitat affected and the location of "higher value" habitat farther downstream from the Project, among other factors. I find that nothing in the 1998 BiOp alters the duty of NFMS, under the ESA, as the consulting agency rather than the action agency to determine a proposed action's effect on a listed species based on the best scientific and commercial data available, which is what occurred here. *See* 16 U.S.C. § 1536; 50 CFR § 402.14(g)(s). Therefore, *Pacific Fed'n* is apposite, and NMFS was not required to independently determine ACS consistency. *See also Or. Natural Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 1005 (D. Or. 2010).

III.    *Plaintiff's Partial Motion for Reconsideration*

Eleven months after my initial ruling, plaintiffs seek reconsideration on their NMFA claim that defendants improperly substituted mitigation or planned restoration for prevention of habitat degradation. Previously, I held that the Forest Service reasonably concluded that the Project does not violate WR-3 and is consistent with the ACS. Specifically, Plaintiffs ask me to reconsider my finding that the fact that although the Project may cause short-term sediment impacts this does not mean that the Project will cause degradation within the meaning of the ACS. (doc. 192 at 30.)

A district court has the discretion to reconsider its prior orders. *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). However, "a motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *389 Orange Street Partners v. Arnold*, 179 F.3d 656, 665 (9th Cir. 1999); *Seiko Epson Corp. v. Glory S. Software Mfg., Inc.*, 684 F. Supp. 2d 1231, 1242 (D. Or. 2010) ("[T]he major grounds that justify reconsideration involve an intervening change in the law, the availability of new evidence, or the need to correct a clear error or prevent

manifest injustice."). Aside from these factors, a district court also has inherent authority to reconsider an interlocutory decision to prevent clear error or prevent manifest injustice. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988). Generally, motions for reconsideration are disfavored, and are not the place for parties to make new arguments that could have been raised earlier with reasonable diligence. *In re Rosson*, 545 F.3d 764, 769 (9th Cir. 2008). Nor should reconsideration be used to ask the Court to rethink its analysis. See *N.W. Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 925–26 (9th Cir. 1988).

Plaintiffs argue that the motion should be granted because there is new evidence in this case and because I committed clear error of law. However, I find that the arguments raised by plaintiff are repetitive of those previously raised in the last round of summary judgment motions. None of those arguments or the information contained in the 2016 BiOp persuades me that my initial ruling was incorrect or contrary to law. Thus, I deny the Motion for Reconsideration.

## CONCLUSION

For the reasons set forth herein, Plaintiff's Motion for Summary Judgment (doc. 215) and Motion for Partial Reconsideration (doc. 216) are DENIED. Defendants' and RLK's Cross Motions for Summary Judgment (docs. 218, 219) are GRANTED. Accordingly, this case is dismissed.

IT IS SO ORDERED.

Dated this 31st day of March 2018.

_Ann Aiken_
Ann Aiken
United States District Judge